MARIC CAPITAL MASTER FUND, LTD., Plaintiff,

v.

PLATO LEARNING, INC., Thoma Bravo, LLC, Project Porsche Holdings Corporation, Project Porsche Merger Corp., Stephen R. Becker, Matthew A. Drapkin, Susan E. Knight, John G. Lewis, M. Lee Pelton, Robert S. Peterkin, Vincent P. Riera, John T. Sanders, and David W. Smith, Defendants.

C.A. No. 5402–VCS.

Court of Chancery of Delaware.

Submitted: May 13, 2010.
Decided: May 13, 2010.

Norman M. Monhait, Esquire, P. Bradford deLeeuw, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Joseph F. Rice, Esquire, William S. Norton, Esquire, J. Brandon Walker, Esquire, Rebecca P. Merritt, Esquire, Motley Rice, LLC, Mt. Pleasant, South Carolina, Attorneys for Plaintiff Maric Capital Master Fund, Ltd.

Gregory P. Williams, Esquire, Blake Rohrbacher, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Wendy J. Wildung, Esquire, Will F. Stute, Esquire, Leif T. Simonson, Esquire, Justin P. Krypel, Esquire, Faegre & Benson, LLP, Minneapolis, Minnesota, Attorneys for Defendants Plato Learning, Inc., Steven R. Becker, Matthew A. Drapkin, Susan E. Knight, John G. Lewis, M. Lee Pelton, Robert S. Peterkin, Vincent P. Riera, J. Ted Sanders, and David W. Smith.

Michael D. Goldman, Esquire, Brian C. Ralston, Esquire, Matthew D. Stachel, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; James F. Basile, Esquire, Eliot A. Adelson, Esquire, Kirkland & Ellis LLP, San Francisco, California, Attorneys for Defendants Thoma Bravo, LLC, Project Porsche Holdings Corporation and Project Porsche Merger Corp.

STRINE, Vice Chancellor.

Earlier today, the plaintiff, Maric Capital Master Fund, Ltd., sought a preliminary injunction against the procession of a proposed merger, involving the acquisition

of PLATO Learning, Inc. ("PLATO") by Thoma Bravo, LLC ("Thoma Bravo") for $5.60 per share. The plaintiff argued that the defendants had failed to comply with their duties under *Revlon v. MacAndrews & Forbes Holdings, Inc.*[1] and its progeny, and that this failure supported the issuance of an injunction against the closing of the merger, which is set for a stockholder vote on May 19, 2010. The buyer can walk away if the merger does not close before June 1, 2010. In a bench ruling, I found that the plaintiff had not established a reasonable probability of success on the *Revlon* issue and that it did not constitute grounds for an injunction. I reserved on three issues raised by the plaintiffs that were more substantial, and indicated that I would rule promptly.

After further reflection on the record and today's argument, I conclude that the merger should be enjoined until corrective disclosures are made on three issues in the corporation's proxy statement.[2] Because the merger vote is fast approaching, there is a risk to stockholders if they wish to support the merger and the termination date of June 1 arrives without closing, and thus there is no benefit, and great danger, to delay if that can be responsibly avoided, I have endeavored to rule expeditiously.

First, the proxy statement presented a materially misleading description of how Craig–Hallum, the investment bank that provided the PLATO board with a fairness opinion, came to its discount rate for its discounted cash flow valuation. In the proxy statement, it says that Craig–Hallum selected discount rates "based upon an analysis of PLATO Learning's weighted average cost of capital."[3] The proxy statement then indicates that Craig–Hallum used a range of 23% to 27% in conducting its DCF.[4] In that respect, it is the literal case that the DCF analysis presented to the Special Committee used a range of 23% to 27%.[5] But that range was not the result of the analysis of the WACC simultaneously given to the Special Committee. In reality, Craig–Hallum calculated two estimates of a so-called WACC, one using a very loose variation of the capital asset pricing model and one using a comparable companies analysis. These generated discounts rates of 22.6% and 22.5%, both very hefty but both below the 23% bottom disclosed in the proxy statement.[6] These analyses were given to the Special Committee.[7]

To explain this discrepancy, the defendants point to the deposition of Craig–Hallum's Hugh Hoffman, who said that Craig–Hallum chose the 23% to 27% range because (1) the WACC of comparable companies was around 25%, (2) PLATO's estimated WACC was about 23%, and (3) Craig–Hallum felt that choosing a higher

---

1. 506 A.2d 173 (Del.1986).

2. *See In re Transkaryotic Therapies, Inc.,* 954 A.2d 346, 360–61 (Del.Ch.2008) ("[A] breach of the disclosure duty leads to irreparable harm. On account of this, the Court grants injunctive relief to prevent a vote from taking place where there is a credible threat that shareholders will be asked to vote without such complete and accurate information."); *In re Pure Resources, Inc. S'holder Litig.,* 808 A.2d 421, 452 (Del.Ch.2002) ("This court has recognized that irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information.").

3. Rohrbacher Aff. Ex. A (PLATO Learning, Inc. Proxy Statement (Apr. 20, 2010)) at 33.

4. *Id.*

5. Rohrbacher Aff. Ex. 7 (Craig–Hallum presentation to PLATO's Special Committee (Mar. 25, 2010)) at PLATO 0060.

6. *Id.* at PLATO 0077.

7. *Id.*

number—27%—was appropriate because PLATO is a micro-cap company with illiquid stock.[8] But there is no evidence that Craig–Hallum told the Special Committee that it chose the 23% to 27% range for these reasons, and, at oral argument, defendants' counsel candidly conceded that there is no evidence, such as board minutes, indicating that Craig–Hallum ever told the Special Committee these reasons. As important, the only tangible evidence of any *actual analysis* by Craig–Hallum is the analysis generating the 22.5% and 22.7% figures. Thus, I conclude that the proxy statement, which explains that the range is derived from PLATO's WACC analyses, is likely misleading. Indeed, the explanation that the 25% figure was necessary because that was the WACC of Saba, a company which Craig–Hallum considered most comparable to PLATO, is directly contradicted by Craig–Hallum's analysis of the discount rate using a comparable company approach, an analysis that resulted in a 22.5% rate.[9] Because of the use of this lofty 23–27% range, the deal price is portrayed as being more favorable than it would have been if Craig–Hallum had used even the girthy 22.5% and 22.6% discount rates derived in its actual calculations. Notably, these large rates are comprised

of eyebrow-raising premiums that Craig–Hallum heaped on top of the core CAPM analysis, including a technology "industry risk premium" of 1.4% and a small cap premium of 9.5%.[10] These alone comprise a cost of equity higher than many blue chip companies. Because PLATO has no debt, its cost of capital equals its cost of equity. The idea that Craig–Hallum subjectively added a further liquidity discount on top of PLATO's healthy beta of 1.12 and the other subjective discounts is itself dubious as a valuation practice.[11] For now, however, what is critical is that the only actual analysis performed by Craig–Hallum and given to the Special Committee generated discount rates of 22.5% and 22.7%, not anything higher.

Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion.[12] As important, because the failure to describe what the banker actually came up with in its (as noted) quite high WACC, the proxy statement presents a range that suggests that the merger price is far more attractive than what the Craig–Hallum valuation would have shown had it used the discount rate generated by Craig–Hallum's actual "analysis of PLATO Learning's weighted average cost of capital."[13] This, in my

---

8. Hoffman Dep. 65–72.

9. *See supra* note 6.

10. *See* O'Connor Aff. Ex. B at PLATO 0077; Hoffman Dep. at 55–60.

11. Obviously, this approach has the risk of counting identical risks multiple times—*e.g.*, heaping a liquidity discount based on a small market capitalization on top of a small stock premium. Indeed, the use of a liquidity discount by a *sell-side* banker is strange for many reasons, including the legal one that such discounts cannot be considered in appraisal, *see Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144–45 (Del.1989), and several business reasons, including PLATO's status as a public company.

12. *See In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9, 25 (Del.Ch.2004) ("[W]hile directors do not have to provide information that is simply 'helpful,' once they take it upon themselves to disclose information, that information must not be misleading."); *see also Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977) (holding that defendants had violated their duty of disclosure where they disclosed a "floor" value but not an equally reliable "ceiling" value, because "full disclosure ... was a prerequisite" to endorsing one value over another).

13. Rohrbacher Aff. Ex. A (PLATO Learning, Inc. Proxy Statement (Apr. 20, 2010)) at 33. *Cf. In re Topps Co. S'holders Litig.*, 926 A.2d 58, 74–77 (Del.Ch.2007) (finding that a proxy

view, bears materially on the decision to be made by PLATO's stockholders. Unless the proxy statement is supplemented by a corrective disclosure indicating the value that would be obtained by using the discount rates Craig–Hallum actually calculated, the merger will be enjoined.

Likewise, the proxy statement selectively disclosed projections relating to PLATO's future performance. In particular, the proxy statement for some inexplicable reason excised the free cash flow estimates that had been made by PLATO's management and provided to Craig–Hallum. This is odd. Although I recognize that there is a legitimate concern about the prolixity of proxy statements and that reasonable minds might differ on this issue,[14] in my view, management's best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information.[15] If, as is encouraged under sound corporate finance

theory, the value of stock should be premised on the expected future cash flows of the corporation,[16] the question that PLATO investors should be asking in determining whether to vote for the cash merger is clear: is the price being offered now fair compensation for the benefits I will receive as a stockholder from the future expected cash flows of the corporation if the corporation remains as a going concern? The trade off here is that PLATO's stockholders can get $5.60 for sure, but must forsake the value that might obtain if the corporation remains independent and delivers on management's expected cash flows.

Given the centrality of this issue, I believe that the proxy statement omits material information by, for reasons not adequately explained, selectively removing the free cash flow estimates from the projections provided to PLATO's stockholders.

was materially misleading where it did not disclose a second, more conservative analysis prepared by the target's financial advisor, but instead used an "analysis [that] cast the price [the acquiror] was offering to pay in a quite different light").

**14.** *See In re PNB Holding Co. S'holders Litig.,* 2006 WL 2403999, at *16 (Del.Ch. Aug. 18, 2006) ("Even in the cash-out merger context, though, it is not our law that every extant estimate of a company's future results, however stale or however prepared, is material."); *see also In re General Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *13 (Del.Ch. May 4, 2005) ("Delaware law does not require 'directors to bury the shareholders in an avalanche of trivial information. Otherwise, shareholder solicitations would become so detailed and voluminous that they will no longer serve their purpose.) (citations omitted' ").

**15.** *See In re Netsmart Techs., Inc. S'holders Litig.,* 924 A.2d 171, 203 (Del.Ch.2007) ("When stockholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular

importance. This is because the stockholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows."); *see also David P. Simonetti Rollover IRA v. Margolis,* 2008 WL 5048692, at *10 (Del.Ch. June 27, 2008) ("A proxy statement should 'give the stockholders the best estimate of the company's future cash flows as of the time the board approved the [transaction].' " (quoting *Netsmart,* 924 A.2d at 203)).

**16.** *See* RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE 75 (7th ed. 2003) ("[The] value [of stock] always equals future cash flow discounted at the opportunity cost of capital."); SHANNON P. PRATT, ROBERT F. REILLY & ROBERT P. SCHWEIHS, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 40 (4th ed. 2000) ("The value of [stock] depends upon an estimate of the future benefits and the required rate of return at which those future benefits are discounting back to the valuation date.").

Until this information is disclosed, the merger will be enjoined.

Finally, the proxy statement also says that "[i]n reaching their decision to approve the merger and the merger agreement," PLATO's special committee and board considered "the fact that Thoma Bravo did not negotiate terms of employment, including any compensation arrangements or equity participation in the surviving corporation, with [PLATO's] management for the period after the merger closes." [17] This statement suggests that the decision whether to sell PLATO to Thoma Bravo was unaffected by any understandings between Thoma Bravo and the company's management about future economic arrangements. Although it may be the case that there were not "negotiations" over a formal employment agreement between PLATO's CEO, Vincent Riera, and Thoma Bravo, the reality is that Riera had extended discussions with Thoma Bravo in which the typical equity incentive package given by Thoma Bravo to management was discussed.[18] That package was described as typically consisting of 10% of the common stock, with 4% going to the CEO, and the record suggests that Riera was led to believe that the typical package could be expected and that top management would likely be retained.[19] During those discussions, Riera also specifically asked whether Thoma Bravo liked to retain management, and was assured that Thoma Bravo typically liked to keep existing management after an acquisition.[20] Although I see no reason in the record or from my understanding of industry practices to believe that PLATO's management would not have rationally believed that another private equity buyer would provide incumbent management with similar incentives, the proxy statement in my view creates the materially misleading impression that management was given no expectations regarding the treatment they could receive from Thoma Bravo.[21] The proxy statement should be corrected to clarify the extent of actual discussions between Riera and Thoma Bravo.

The parties shall collaborate on an implementing order. Once timely and satisfactory disclosures are made in a way that gives the PLATO stockholders adequate opportunity to digest them before a final merger vote, the injunction will be lifted.

17. Rohrbacher Aff. Ex. A (PLATO Learning, Inc. Proxy Statement (Apr. 20, 2010)) at 25.

18. *See* Riera Dep. at 72, 89.

19. *Id.* at 92–93; deLeeuw Aff. Ex. 20 (handwritten notes of Riera) at PLATO 0967.

20. *See* Reira Dep. at 73 (indicating that, at a dinner with Thoma Bravo sometime in February 2010, he had "asked if they [Thoma Bravo] typically teamed with existing management teams or they had their own management teams that they like to put in place, in which case they responded we typically team with existing management teams"); *see also* deLeeuw Aff. Ex. 26 (initial offer letter from Thoma Bravo to PLATO (July 30, 2009)) (indicating that "[a]s with most of our investments, Thoma Bravo views this transaction as an opportunity to partner with PLATO's current management team to continue to build the Company. As such we would expect to offer the Company's management a market based compensation package, including significant incentive ownership interest in the business going forward.").

21. *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del.1994) ("[O]nce the defendants traveled down the road of partial disclosure of the history leading up to [a merger], they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.").