COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

June 13, 2014

Brian D. Long, Esquire
Rigrodsky & Long, P.A.
2 Righter Parkway, Suite 120
Wilmington, DE  19803

Peter J. Walsh, Jr., Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE  19801

Kenneth J. Nachbar, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE  19801

Re:   *In re TriQuint Semiconductor, Inc. Stockholders Litigation*
C.A. No. 9415-VCN
Date Submitted: June 9, 2014

Dear Counsel:

Plaintiffs, shareholders of TriQuint Semiconductor, Inc. ("TriQuint"), moved to expedite their claims that TriQuint's board breached its fiduciary duties by agreeing to a stock merger with RF Micro Devices, Inc. ("RFMD"). Specifically, Plaintiffs contend that TriQuint's eight-member board failed to obtain adequate consideration for shareholders, engaged in defensive tactics to thwart an activist investor's threat to replace the board, agreed to preclusive deal provisions,

and failed to provide all material information in advance of the shareholder vote.[1]

TriQuint and RFMD have agreed to a so-called merger of equals, in which the shares of each company will be exchanged for shares of newly-formed Rocky Holding, Inc. ("Rocky Holding"), with the shareholders of each company set to own 50% of the new entity.[2] Neither TriQuint nor RFMD has yet scheduled a special meeting to seek shareholder approval.

* * * * *

Some brief background is necessary. Before agreeing to the merger, TriQuint had been contemplating a possible combination with RFMD for almost five years.[3] More recently, in February 2013, RFMD proposed to acquire TriQuint in an all-stock transaction. TriQuint's board determined that RFMD's offer was inadequate in April 2013. Two months later, Company B submitted an unsolicited

---

[1] Verified Consolidated Am. Class Action Compl. ("Compl.") ¶¶ 100-09. Plaintiffs also assert claims of aiding and abetting the board's breaches of duty against various parties. *Id.* ¶¶ 110-13.

[2] TriQuint's common stock will be converted into the right to receive 0.4187 shares of Rocky Holding common; RFMD's common stock will be converted into the right to receive 0.25 shares of Rocky Holding common. The proposed structure represents an implied price of $9.73 for each TriQuint share, and a 5.4% premium based on the closing price of $9.23 per share on February 21, 2014, the last trading day before the merger agreement was signed. *Id.* ¶ 3.

[3] *Id.* ¶ 53. The following account is drawn from the Complaint. *Id.* ¶¶ 55-78.

cash offer to acquire TriQuint for $8.25 per share; TriQuint's board again decided not to pursue a sale at that time.

In August 2013, TriQuint and RFMD began new discussions on a possible merger of equals. Soon thereafter, TriQuint's board authorized Goldman Sachs, its financial advisor, to contact Company B and assess its interest in a business combination. By November 2013, TriQuint received a term sheet from RFMD and an indication of interest from Company B to acquire TriQuint for $10.00 per share through a 50% cash and 50% stock transaction. In December, in the midst of considering these proposals, the TriQuint board received a letter from one of its shareholders, Starboard Value ("Starboard"), proposing a new slate of six director nominees for the company's 2014 annual meeting.

On December 13, 2013, the TriQuint board decided it would not accept RFMD's offer because of concerns regarding potential market reaction to both companies' near term financial results. TriQuint's board sought to improve Company B's proposal and was informed by Goldman Sachs, on December 15, that Company B had increased its 50% cash and 50% stock offer to $10.10 per

share. On December 17, 2013, TriQuint's board decided not to pursue either transaction.

Meanwhile, Starboard met with RFMD at the end of January 2014 to pitch the merits of a merger with TriQuint. RFMD soon notified TriQuint, which resulted in TriQuint's CEO contacting Company B's CEO and scheduling a meeting with another possible acquirer, Company C. TriQuint also requested Goldman Sachs to reengage with RFMD's financial advisor regarding a possible transaction. For unclear reasons, Company B withdrew from the process on February 18, 2014. That same day, TriQuint's board decided to pursue a transaction with RFMD. The sale process culminated on February 22, 2014, when, after receiving a fairness opinion from Goldman Sachs, TriQuint's board approved the merger with RFMD.

During the briefing of this motion, TriQuint filed an amended proxy statement disclosing information underlying several of Plaintiffs' disclosure claims. Plaintiffs do not dispute that those issues have been resolved, although the parties may disagree about whether there was any causal connection between the initial claims and the supplemental disclosures. Accordingly, the Court considers

Plaintiffs' remaining claims related to the merger process, certain deal protection devices in the merger agreement, and the remaining disclosure issues.

\* \* \* \* \*

Plaintiffs bear the burden of showing good cause for expedited proceedings.[4] The standard for a motion to expedite is familiar: the Court must determine "whether in the circumstances the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding."[5]

A. *The Process Claims*

Plaintiffs primarily contend that TriQuint's board members, in response to Starboard's letter, took defensive actions to retain their lucrative positions by fast-tracking the negotiations with RFMD to preserve the seats of five of eight TriQuint directors in the post-merger entity. They assert that TriQuint's board staved off a cash offer from another bidder, Company B, and favored RFMD—and the

---

[4] *See Greenfield v. Caporella*, 1986 WL 13977, at *2 (Del. Ch. Dec. 3, 1986).
[5] *Police & Fire Ret. Sys. of City of Detroit v. Bernal*, 2009 WL 1873144, at *1 (Del. Ch. June 26, 2009) (citation omitted).

possibility of post-merger directorships—in the process. Plaintiffs denigrate this conduct as improper entrenchment under *Unocal Corp. v. Mesa Petroleum Co.*[6]

Plaintiffs' allegations do not give rise to a colorable claim under this theory of liability. First, this theory is belied by Plaintiffs' own allegations. In order to entrench itself from a potential proxy contest by Starboard, the TriQuint board purportedly agreed to merge with RFMD—a company with which it had been considering a transaction for quite some time—in a deal that Starboard supported. These facts do not support a colorable claim because Plaintiffs have not articulated, even for purposes of a motion to expedite, how the stock merger with RFMD— pursuant to which Starboard will presumably become a shareholder of the combined company, Rocky Holding—entrenches the TriQuint board from a subsequent proxy contest.

---

[6] 493 A.2d 946 (Del. 1985).

Plaintiffs' submissions to the Court could arguably be read to suggest that the TriQuint board's agreeing to the stock merger with RFMD implicated *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), and the enhanced standard of review in which the Court examines the reasonableness of the directors' conduct in maximizing the corporation's value. However, this stock-for-stock transaction in which ownership of the corporation will remain "in a large, fluid, changeable and changing market" is outside the bounds of *Revlon*. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 47 (Del. 1994)).

Second, Plaintiffs have not alleged a colorable claim that the TriQuint directors were sufficiently interested in continuing as directors that they could not impartially consider the merits of the RFMD merger. "In most circumstances Delaware law routinely rejects the notion that a director's interest in maintaining his office, by itself, is a debilitating factor."[7] Similarly, "the mere fact that the directors receive fees for their service is not enough to establish an entrenchment motive."[8] To state a claim that otherwise independent and disinterested directors acted disloyally by agreeing to a transaction, "a plaintiff must allege facts as to the interest and lack of independence of the *individual members* of that board,"[9] including the materiality of that interest to the directors.[10] Plaintiffs have not demonstrated that remaining a director—especially where three of the eight

---

[7] *Solomon v. Armstrong*, 747 A.2d 1098, 1126 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (Table).

[8] *Kahn v. MSB Bancorp, Inc.*, 1998 WL 409355, at *3 (Del. Ch. July 16, 1998), *aff'd*, 734 A.2d 158 (Del. 1999).

[9] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (emphasis in original).

[10] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 25 (Del. Ch. 2014).

TriQuint directors will not be on the board of the combined entity[11]—was material to the TriQuint board, even to support a colorable claim of entrenchment.

Third, Plaintiffs' contention that TriQuint's board "staved off" Company B is also undermined by their allegations. Plaintiffs pled that TriQuint's CEO reinitiated contact with Company B in February 2014 and that it was Company B which withdrew from the sale process.[12] It is not colorable, based on these allegations, that the TriQuint board had any influence on Company B's decision to withdraw.

In summary, Plaintiffs' process allegations, viewed separately or collectively, do not give rise to a colorable claim of entrenchment that may warrant enhanced scrutiny by the Court of the TriQuint board's actions. Further, under the resulting business judgment standard of review, it is not colorable that the merger with RFMD was irrational. Thus, these allegations do not justify expediting this action.

---

[11] *See Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("[T]hat several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest.").

[12] Compl. ¶ 28.

B. *The Deal Protection Devices*

Plaintiffs also contend that enhanced scrutiny should apply because the merger agreement contains certain deal protection devices, including a no solicitation provision, matching rights for RFMD, and a termination fee of $66.7 million (representing approximately 2.8% of the $2.385 billion preliminary purchase price).[13] When evaluating the reasonableness of deal protection measures under *Unocal*, this Court engages in a "nuanced, fact-intensive inquiry"[14] and will consider "the preclusive or coercive power of all deal protections included in a transaction, taken as a whole."[15] For purposes of a motion to expedite, Plaintiffs must articulate a sufficiently colorable claim that a "given set of deal protections operate[s] in an unreasonable, preclusive, or coercive manner."[16]

The individual contract provisions that Plaintiffs challenge are not uncommon. This Court has recently declined to enjoin transactions because of

---

[13] TriQuint Defs.' Br. in Opp'n to Pls.' Mot. for Expedited Proceedings (Defs.' Br.), Ex. 2 at 47.

[14] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015 (Del. Ch. 2005).

[15] *Louisiana Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del. Ch. 2007).

[16] *Cf. id.* (analyzing various deal protection devices in the preliminary injunction context).

their existence, even in combination with other deal protection devices.[17] This preliminary injunction case law is not dispositive of the Court's analysis here because a given set of deal protection devices must be analyzed under the facts and circumstances alleged in the case at hand,[18] but it is nonetheless instructive. Plaintiffs have not sufficiently articulated how these familiar and generally permissible merger agreement provisions, individually or in tandem, operate in a colorably unreasonable, preclusive, or coercive manner. Plaintiffs' allegations regarding the contract provisions of the merger agreement do not support an expedited proceeding.

---

[17] *See, e.g.*, *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 673736, at *2-4 (Del. Ch. Feb. 25, 2013) (declining to enjoin a transaction where the operative agreement included a no-shop clause, a top-up feature, matching rights, a termination fee, a poison pill feature, and a standstill agreement); *see also In re Orchid Cellmark Inc. S'holder Litig.*, 2011 Wl 1938253, at *6-8 (Del. Ch. May 12, 2011).

[18] *See In re Toys "R" Us, Inc.*, 877 A.2d at 1016 ("That reasonableness inquiry [of deal protection devices] does not presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal. Instead, that inquiry examines whether the board granting the deal protections had a reasonable basis to accede to the other side's demand for them in negotiations. In that inquiry, the court must attempt, as far as possible, to view the question from the perspective of the directors themselves, taking into account the real world risks and prospects confronting them when they agreed to the deal protections.").

C. *The Disclosure Claims*

Plaintiffs also assert a series of disclosure claims that can be grouped into four general categories: (i) TriQuint's financial projections; (ii) Goldman Sachs's financial analysis; (iii) alleged conflicts of interest; and (iv) the sale process. "[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[19]  Such information is material when there is a substantial likelihood a reasonable shareholder would regard it as having significantly altered the "total mix" of information available.[20]  Thus, the inquiry here is whether it is sufficiently colorable that the alleged misstatements or omissions are material information within the TriQuint board's control.

1.  TriQuint's Financial Projections

Plaintiffs argue that the quantified effects of certain non-routine transactions and certain acquisition and restructuring charges are material information that should have been disclosed in the summary of TriQuint's projections in its proxy

---

[19] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

[20] *See id.* (emphasis omitted).

materials.  Plaintiffs, in effect, seek additional details that are not just granular, but border on minutiae.  It is not colorable that this additional information would be material because, by its very terms, it is non-routine.  In addition, it is not colorable that this non-routine information is necessary to make the financial projections non-misleading.[21]

For similar reasons, Plaintiffs have not stated a colorable claim that the TriQuint directors must disclose whether the projections contemplate spin-offs or divestitures.  Under Delaware law, "[s]peculation is not an appropriate subject for a proxy disclosure."[22]  Plaintiffs have not demonstrated, even under the minimal colorable claim standard, that this type of speculative information is currently within the TriQuint board's control, let alone material.

2.  Goldman Sachs's Financial Analysis

According to Plaintiffs, the proxy statement fails to disclose certain material analyses conducted by Goldman Sachs, TriQuint's financial advisor.  When a board of directors relies upon a financial advisor in justifying to shareholders the

---

[21] *See, e.g., Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010).

[22] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 145 (Del. 1997).

merits of a proposed transaction, the board must disclose "a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote . . . rely."[23] In other words, "when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed."[24]

The Court cannot conclude that it is colorable that a fair summary of Goldman Sachs's financial analysis was not disclosed in the proxy materials. The desired value uplift range was provided in the *Value Uplift* section of the proxy, relative equity contribution ratios were disclosed, and the implied per share value uplift ranges for the fiscal years 2015-17 were disclosed. Again, Plaintiffs seek more information, such as the basis for using certain earnings per share multiples, more information in the *Selected Companies Analysis*, and the assumptions behind the cost of equity for TriQuint and the post-merger company, Rocky Holding. It is

---

[23] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002).
[24] *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203-04 (Del. Ch. 2007).

not colorable that this information, although certain TriQuint shareholders may not mind having to parse through an even longer proxy statement, was within the TriQuint board's control or material to a reasonable TriQuint shareholder.[25] This claim epitomizes the "limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies."[26] Plaintiffs have plainly not stated a colorable claim.

### 3. Alleged Conflicts of Interest

Next, Plaintiffs allege additional disclosure violations regarding potential management and financial advisor conflicts of interest. As to the first category, the TriQuint board's supplemental proxy disclosures included additional information on this point, such as noting the conversations between the CEOs of TriQuint and RFMD regarding management retention and board composition. It is not colorable that additional information beyond this and related supplemental disclosures would alter the total mix of information available to TriQuint shareholders in considering

---

[25] Counsel for the TriQuint board represented to the Court that Goldman Sachs did not calculate, and thus did not present to the TriQuint board, a range of prices per share using a discounted-cash flow approach because the proposed transaction is a stock-for-stock merger. *See* Letter from Peter J. Walsh, Esquire (June 10, 2014). Plaintiffs' suspicions to the contrary do not change the Court's conclusion. *See* Letter of Brian D. Long, Esquire (June 11, 2014).

[26] *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009).

the merits of the proposed merger.  That is, it is not colorable that the additional information sought by Plaintiffs here is material.

As to the second category, Plaintiffs seek further information regarding the possible contingency of Goldman Sachs's $23 million fee and the TriQuint board's discretion to pay Goldman Sachs an additional $3 million.[27]  The proxy statement notes:

> Pursuant to the terms of the engagement letter, TriQuint has agreed to pay Goldman Sachs a transaction fee of approximately $23 million plus an additional amount in TriQuint's sole discretion of up to approximately $3 million, all of which is payable upon completion of the mergers.[28]

The only reasonable reading of this sentence is that, were the merger with RFMD not to close, then Goldman Sachs would not receive any portion of the $23 million fee.  Consequently, the $23 million mandatory fee appears to be fully contingent. Plaintiffs' allegations do not support a colorable claim to the contrary.  The additional $3 million discretionary fee is less than 15% of the $23 million fee payable to Goldman Sachs upon closing of the merger.  Given the disclosed fee

---

[27] As with the alleged management conflict disclosure violations, the TriQuint board disclosed additional information underlying Plaintiffs' financial advisor conflict disclosure claims in the supplemental proxy materials.

[28] Defs.' Br., Ex. 2 at 97.

and this easy-to-calculate ratio, it is not colorable that additional information regarding the $3 million would be material to TriQuint stockholders.

### 4. The Sale Process

Finally, Plaintiffs contend the TriQuint board failed to disclose material information about its efforts to sell the company. The allegation advanced most strongly by Plaintiffs relates to the value the board attributed to the company's infrastructure and defense business in early 2013 when it concluded that RFMD's acquisition proposal was inadequate. This information is not colorably material.[29] The failure to disclose the value ascribed to a division of TriQuint's business at one point during a years' long sale process cannot be said to state a colorable claim that this information would alter the total mix regarding the negotiations between TriQuint and RFMD. The other sale process allegations, to the extent the underlying information was not disclosed in TriQuint's supplemental proxy, are likewise not colorable disclosure claims.

---

[29] *See, e.g., Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at \*15 (Del. Ch. Mar. 7, 1991) ("Where, as here, 'arm's-length negotiation has resulted in an agreement which fully expresses the terms essential to an understanding by shareholders of the impact of the merger, it is not necessary to describe all the bends and turns in the road which led to that result.'").

* * * * *

For the reasons set forth above, Plaintiffs have failed to allege a colorable claim that TriQuint's directors have breached their fiduciary duties to warrant expediting these proceedings.[30]  Therefore, Plaintiffs' motion is denied.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:  Ryan M. Ernst, Esquire
Blake A. Bennett, Esquire
Register in Chancery-K

---

[30] Without a colorable claim, there is no need to address the likelihood of irreparable harm.