# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TEAMSTERS LOCAL 677 HEALTH SERVICES & INSURANCE PLAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRANK D. MARTELL,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2021-1075-NAC |

## MEMORANDUM OPINION

Date Submitted: October 25, 2022
Date Decided: January 31, 2023

Stephen E. Jenkins, Tiffany Geyer Lydon, ASHBY & GEDDES, P.A., Wilmington, Delaware; Donald J. Enright, Elizabeth K. Tripodi, Jordan A. Cafritz, LEVI & KORSINSKY, LLP, Washington, D.C.; Gregory Nespole, LEVI & KORSINSKY, LLP, New York, New York; Frank Shirripa, Daniel B. Rehns, HACH ROSE SHIRRIPA & CHEVERIE LLP, New York, New York; *Counsel for Plaintiff*.

Robert S. Saunders, Cliff C. Gardner, Matthew P. Majarian, Ryan M. Lindsay, Trevor T. Nielson, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendant*.

**COOK, V.C.**

Plaintiff is a former stockholder of CoreLogic, Inc. (the "Company"). In late June 2020, two funds made an unsolicited joint proposal to acquire the Company. The Company's board of directors (the "Board") rejected the proposal as undervalued. After a proxy contest, the funds succeeded in electing three directors to the Board.

The public announcement of the funds' acquisition proposal stirred significant interest in the Company. So the Board initiated a months-long strategic alternatives process. After many months of shopping the Company, the Board narrowed the field of bidders to a financial buyer and a strategic buyer, CoStar Group, Inc. The financial buyer proposed an all-cash transaction. CoStar proposed an all-stock transaction. Both proposals were disclosed to stockholders in the Company's proxy statement (the "Proxy Statement").

Based on cash, antitrust, and closing considerations, the Board selected the financial buyer. Then CoStar publicly submitted two post-signing, competing bids. Both bids were disclosed in the Proxy Statement.

CoStar's stock offer was nominally more valuable than the cash offer. But that nominal value was uncertain. CoStar's proposals also raised antitrust concerns. Regulatory scrutiny could have delayed a closing date by up to 15 months. All these considerations were disclosed in the Proxy Statement.

1

CoStar's competing bids were unresponsive to the Board's regulatory and closing concerns and did not provide enough cash to address volatility in CoStar's stock. Indeed, CoStar's stock suffered a 19% price decline at the time CoStar submitted the competing bids. Still, the Board believed that CoStar had the potential to make a superior proposal. So the Board encouraged CoStar to improve its terms. But CoStar walked.

In June 2021, the financial buyer acquired the Company for $6 billion in cash (the "Merger"). The Merger generated a 51% premium to the Company's unaffected stock price. The stockholders voted overwhelmingly in favor of the Merger.

CoStar's CEO, Andrew Florance, commented publicly on the Merger. In an online article, Florance was paraphrased as stating that the Board chose the Merger over a CoStar deal to entrench the Company's management. In his own words, Florance stated generically that, in strategic mergers, "inevitably some of [senior management's] jobs go away" and "[t]hat's a powerful motive to not do a deal."

Plaintiff brought a books-and-records action against the Company to investigate potential wrongdoing. Plaintiff obtained documents and agreed to incorporate all of them into its complaint.

None of the Company's 11 outside directors is alleged to be conflicted. None of the Board's advisors is alleged to be conflicted. None of the stockholders is alleged to be a conflicted controller. The vote is not alleged to have been coerced.

2

And entire fairness is not alleged to apply to the Merger. As a result, the complaint is subject to dismissal under *Corwin* unless the Merger vote was not fully informed.

To defeat *Corwin* on disclosure grounds, Plaintiff does not rely on the books and records it obtained from the Company. The complaint's version of the facts obscures documents integral to Plaintiff's claim. Plaintiff instead relies exclusively on Florance's statements to argue that the Board's meeting minutes and identified sale considerations must be false. Under this theory, the so-called "real reason" behind the Merger was Martell's undisclosed conflict of interest in protecting his job. In this way, Plaintiff tries to generate a disclosure claim concerning otherwise facially appropriate proxy disclosures made by an independent board with its independent advisors. According to Plaintiff, I must shut my eyes to everything but a handful of statements on the internet attributed to a senior executive of an entity that was publicly unsuccessful in making a topping bid.

One might imagine scenarios where a post-process statement made by a bidder could support a sale process claim. But this is not one of them. The Proxy Statement and board materials unambiguously contradict Plaintiff's theory. And nothing in the complaint otherwise supports Plaintiff's extreme inference that the Company's books and records and public disclosures are false. To the extent

Plaintiff sought to bring a hidden, management-level conflict to light, its own inspection demand snuffed the wick.

It is not reasonably conceivable that the Board committed a disclosure violation. So Plaintiff's claim fails under *Corwin*. But even if *Corwin* did not apply, the complaint would fail for another reason. Only Defendant Frank Martell—the Board's sole inside director—is alleged to have been conflicted. But the Proxy Statement disclosed Martell's potential pecuniary interest in the Merger. And it is not clear from the complaint what role Martell played in the Merger anyway. Save for isolated scenes, he barely appears. In many ways, he is depicted as the Mr. Godot who never arrives.[1]

The complaint is devoid of specific facts from which to infer that Martell steered the Company away from CoStar to entrench himself. Under any standard, then, Plaintiff has failed to state a breach of fiduciary duty claim against Martell. Accordingly, I grant Martell's motion to dismiss.

## I. FACTUAL BACKGROUND

I draw the relevant facts from the Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[2] At this stage, the

---

[1] Samuel Beckett, *Waiting for Godot: A Tragicomedy in Two Acts* (1953).

[2] Citations in the form of "Compl. ¶ —" refer to the Complaint. *See* Dkt. 1. Citations in the form of "Ex. —" refer to the exhibits submitted with Martell's motion. *See* Dkt. 11–

Complaint's well-pleaded allegations are assumed to be true and Plaintiff receives the benefit of all reasonable inferences.

## A. The Parties And Relevant Non-Parties

The Company was a publicly traded Delaware corporation specializing in property market analytics and technology.[3] Plaintiff was a common stockholder of the Company.[4] Martell was the Company's CEO and a member of the Board.[5]

The Board comprised 12 directors. The eleven directors not named as parties to this action were all outside directors.[6] Three of those directors were elected through a proxy contest initiated by Senator Investment Group LP and Cannae Holdings, Inc. (the "Funds").[7]

---

14. Citations in the form of "Tr. —" refer to the transcript of the oral argument on Martell's motion. *See* Dkt. 30.

[3] Ex. 30 at 35 (CoreLogic, Inc., Definitive Proxy Statement (Schedule 14A) (Mar. 30, 2021)) ("Proxy Statement").

[4] Compl. ¶ 8; Dkt. 17 at 1 (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss) ("Opp'n Br.").

[5] Compl. ¶ 9. Martell has since resigned as the Company's CEO. *See* Opp'n Br. at 3 n.1.

[6] CoreLogic, Inc., Annual Report (Form 10-K) at 110 (Mar. 1, 2021). Plaintiff avers that it did not sue the outside directors due to a Section 102(b)(7) exculpatory provision in the Company's charter. *See* Compl. ¶ 22.

[7] Compl. ¶ 44.

Evercore Group L.L.C. served as the Board's principal financial advisor during the sale process.[8]  Skadden, Arps, Meagher, Slate & Flom LLP ("Skadden") served as the Board's legal advisor during the sale process.[9]

CoStar is a publicly traded Delaware corporation that specializes in property market analytics and technology.[10]  CoStar was a strategic bidder.[11]

Stone Point Capital LLC and Insight Partners LLC acquired the Company in the Merger.  Stone Point and Insight were financial bidders.

## B.  The Sale Process

According to the Complaint, in June 2020, the Board determined to consider offers to acquire the Company.[12]

On June 26, 2020, the Funds publicly announced an unsolicited joint proposal to acquire the Company for $65 per share.[13]  The Board rejected the proposal, concluding, among other things, that it "significantly undervalued" the Company.[14]

---

[8] *Id.* ¶ 33.

[9] *Id.* ¶ 38.

[10] CoStar Gp., Inc., Annual Report (Form 10-K) at 5 (Feb. 24, 2021).

[11] *E.g.*, Compl. ¶¶ 39, 41.

[12] *Id.* ¶ 31.

[13] *Id.* ¶ 32.  The Funds increased their bid by $1 a few months later.  *Id.* ¶ 40.

[14] *Id.* ¶ 34.

The Funds responded with a proxy contest.[15] The Funds nominated nine directors to the Board.[16] The stockholders elected three of the Funds' candidates.[17]

According to the Complaint, the Funds' acquisition efforts loomed over the sale process.[18] The Funds' offer, however, also galvanized market-wide interest in acquiring the Company.[19] The Board directed management and its advisors to negotiate with the bidders.[20]

In the fall of 2020, Martell and Florance began discussing a potential strategic merger between the Company and CoStar.[21] At the time, the Board's review of the outstanding bids suggested that the Company was worth at least $80 per share.[22]

On December 15, 2020, CoStar made its first bid.[23] The bid contemplated, among other terms, an all-stock merger at a projected value of $77 to $83 per share.[24]

---

[15] *Id.* ¶¶ 36–37.

[16] *Id.* ¶ 37.

[17] *Id.* ¶ 44.

[18] *Id.* ¶¶ 36, 43, 45.

[19] *Id.* ¶ 33.

[20] *Id.* ¶ 35.

[21] *Id.* ¶¶ 39, 41.

[22] *Id.* ¶ 42.

[23] *Id.* ¶ 46.

[24] *Id.*

In reviewing the bid, the Board compared the value certainty of a cash transaction with the value certainty of an equity transaction.[25] The Board also considered whether closing a CoStar transaction would be delayed by antitrust scrutiny.[26]

On December 28, 2020, the Board ratified an equity-based compensation package for its senior executives, including Martell.[27] The package contained a $27.5 million "golden parachute" provision payable upon a change of control.[28] The "golden parachute" provision would have been triggered regardless of the buyer.[29] The Proxy Statement disclosed Martell's potential pecuniary interest in the Merger and explained the nature and operation of management's compensation package.[30]

At a January 17, 2021, Board meeting, Martell informed the directors that Florance and he spoke earlier that day about the prospect of post-Merger employment with CoStar.[31]

---

[25] *Id.* ¶ 93 (citing Proxy Statement at 47).

[26] *Id.* (citing Proxy Statement at 47).

[27] *Id.* ¶ 47.

[28] *Id.* ¶¶ 73–74, 99.

[29] *See, e.g., id.* ¶ 75; *see also* Opp'n Br. at 25–27.

[30] Compl. ¶ 99 (copying image from Proxy Statement at 78–83).

[31] *Id.* ¶ 48.

On January 19, 2021, CoStar revised its initial bid.[32]  The revised bid proposed an all-stock merger nominally valued at $79 per share.[33]

On January 22, 2021, Stone Point itself proposed an all-cash take-private transaction valued at $77 per share.[34]

On January 23, 2021, the Board countered CoStar's January 19 offer.[35]  The Board proposed (i) an all-stock transaction at an implied value of $85 per share; (ii) that CoStar accept remedies to obtain required regulatory approvals and agree not to take action that would delay or increase the risk of obtaining those approvals; (iii) a closing date of no more than 12 months from signing; and (iv) certain restrictions on employee retention efforts prior to a closing.[36]

On January 29, 2021, CoStar countered the Board.  Among other terms, CoStar proposed an all-stock transaction with an implied value of $82.53 per share.[37] The Board's discussions of CoStar's counteroffer centered on cash consideration,

---

[32] *Id.* ¶ 49.

[33] *Id.*

[34] *Id.* ¶ 50.

[35] *Id.* ¶ 51.

[36] *Id.*

[37] *Id.* ¶ 53.

closing speed, and antitrust assurances.[38]  Based on these considerations, the Board

rejected the counteroffer.

On February 1, 2021, CoStar returned with what it described as a "best and

final" offer.[39]  CoStar again proposed an all-stock transaction.[40]  This time, CoStar

increased the nominal purchase price to $86.30 per share.[41]

On February 3, 2021, Stone Point, now joined by Insight, proposed an all-cash

take-private transaction valued at $80 per share.[42]

On February 3 and 4, 2021, the Board met with its advisors to consider Stone

Point and Insight's proposal relative to CoStar's "best and final" offer.[43]

On February 4, 2021, the Board unanimously accepted Stone Point and

Insight's offer.[44]  In approving the Stone Point-Insight merger agreement, "[t]he

Board considered that, while the closing of the Merger is subject to certain regulatory

approvals, there are not likely to be significant antitrust or other regulatory

---

[38] *Id.* ¶ 54.

[39] *Id.* ¶ 55.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* ¶¶ 56–57.

[44] *Id.* ¶ 58.

impediments to the closing . . . given the respective asset mixes of Stone Point and Insight [], as well as the Merger['s] significant protection against any regulatory impediments that could arise . . . ."[45]

On February 16, 2021, CoStar publicly submitted a competing bid to acquire the Company (the "Competing Proposal"). The Competing Proposal offered a stock-for-stock transaction valued at $95.76 per share.[46] CoStar claimed that the Competing Proposal would not present "meaningful antitrust concerns."[47]

On February 17 and 21, 2021, the Board met with its advisors to evaluate the Competing Proposal.[48] The Board indicated interest, noting that the Company was "prepared to pursue an all-stock transaction" at that time.[49] The Board also determined that the Competing Proposal would reasonably be expected to result in a "Superior Proposal" under the Stone Point-Insight merger agreement and authorized Company representatives to negotiate with CoStar.[50]

---

[45] *Id.* ¶ 93 (quoting Proxy Statement at 62).

[46] *Id.* ¶¶ 61–62 (citing Ex. 25 (Competing Proposal)).

[47] *Id.* ¶ 61 (quoting Ex. 25 (Competing Proposal)).

[48] *Id.* ¶ 62.

[49] *Id.*

[50] *Id.* ¶ 63.

On February 21, 2021, Martell communicated a Board-authorized counteroffer to CoStar.[51] The counteroffer proposed, among other terms, that CoStar (i) increase the "certainty of value" of the Competing Proposal by adding a cash component; and (ii) address the Board's previously stated antitrust concerns.[52]

On March 1, 2021, CoStar publicly submitted revisions to the Competing Proposal (the "Revised Competing Proposal").[53] The Revised Competing Proposal included a $6.00 cash component, for an implied value of $90 per share.[54] CoStar reiterated its view that a transaction would pose "no meaningful antitrust issues."[55]

On March 3, 2021, the Board met with its advisors to evaluate the Revised Competing Proposal. The Board determined that CoStar should "substantially increase" the cash component and address the Board's antitrust concerns.[56] The Board continued to believe CoStar had the ability to top the Merger and directed that the Board's counter be conveyed to CoStar.[57]

---

[51] *Id.* ¶ 64.

[52] *Id.*

[53] *Id.* ¶ 65 (referencing Ex. 26 (Revised Competing Proposal)).

[54] *Id.*

[55] *Id.* (quoting Ex. 26 (Revised Competing Proposal)).

[56] *Id.* ¶ 66.

[57] *Id.* (referencing Ex. 18 (Mar. 3, 2021 Bd. Minutes)); *id.* ¶ 67 (referencing Proxy Statement at 60).

CoStar did not respond.[58]  The Complaint alleges that the Board "rejected" CoStar on March 4, 2021.[59]

## C. The Closing Of The Merger

The Company's stockholders voted overwhelmingly in favor of the Merger. The Merger generated $6 billion or a 51% premium to the Company's unaffected stock price as of June 25, 2021.[60]  On the closing date, Stone Point and Insight announced that they would retain Company management.[61]

## D. The Bisnow Article

On March 16, 2021, Florance was interviewed about the Company's sale process by "Bisnow" (the "Bisnow Article").[62]  The Bisnow Article stated that the Company raised "the threat of antitrust litigation" in its negotiations with CoStar.[63] But Florance reportedly was not convinced.  Under a heading titled "'People Just

---

[58] *Id*. ¶ 67.  As discussed later in this decision, CoStar issued a press release explaining why it did not respond.

[59] *Id.* ¶ 4.

[60] *Id.* ¶ 1 (referencing Proxy Statement at 61).

[61] *Id.* ¶¶ 103–04.

[62] *See, e.g.*, *id.* ¶ 67 (citing John Banister, *CoStar to Look at New Sectors for Next Acquisitions After Failed Deals, FTC Scrutiny*, Bisnow (Mar. 16, 2021), https://www.bisnow.com/national/news/technology/costar-to-look-at-new-sectors-for-next-round-of-acquisitions-after-failed-deals-108133 ("Bisnow Article")).

[63] Bisnow Article.

Don't Like CoStar'," the Bisnow Article paraphrased Florance as stating that he "believe[d] antitrust issues had nothing to do with [the Company's] decision to turn down [CoStar's] offer."[64] The Bisnow Article also quoted a Morningstar analyst, who reportedly was "skeptical" of the Company's antitrust concerns and thought they were not "substantiated."[65]

As a reported ulterior motive for the Company's decision to pursue the Merger, the Bisnow Article paraphrased Florance as stating that he thought the Company's "executives didn't want to be acquired by CoStar because some of them would have lost their jobs."[66] In his own words, Florance said:

> Most of the senior management team there might earn eight digits a year of compensation, and in a merger, especially a strategic merger, inevitably some of those jobs go away . . . . That's a powerful motive to not do a deal.[67]

### E. The 220 Action

On April 27, 2021, Plaintiff brought a books-and-records action against the Company under Section 220 of the Delaware General Corporation Law (the "220 Action"). The purpose of the 220 Action was to investigate potential wrongdoing

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

and, if warranted, to bring a breach of fiduciary duty claim.[68]   Through the 220

Action, Plaintiff sought to inspect, among other things, all Board-level materials

surrounding the Merger.  Plaintiff obtained those materials and then stipulated to the

dismissal of the 220 Action.[69]

## F.  This Litigation

Having obtained the books and records it sought, Plaintiff filed the Complaint.

The Complaint does not allege that the Board's outside directors were

conflicted.  It does not allege that the Board's advisors were conflicted.  It does not

allege the presence of a conflicted controller.  And it does not allege that the Proxy

Statement failed to disclose the Board's antitrust concerns or Martell's potential

pecuniary interests in the Merger.  Instead, Plaintiff cites the Bisnow Article to posit

forensically that the Board's meeting minutes and the Proxy Statement's disclosures

must be false.[70]

---

[68] *See* Dkt. 1 at 1–2, C.A. No. 2021-0360-JTL (Del. Ch. Apr. 27, 2021).

[69] *See* Dkt. 13 (Order Granting Joint Stipulation of Dismissal), in *id.*

[70] *See* Tr. at 80:6–17 ([Pl.'s Couns.]: "I don't think I'm shocking anybody here.  Absent those statements by Mr. Florance, we would not have filed this lawsuit. That's just the reality. But where you have public statements by a firsthand participant in those conversations saying one thing versus, you know, these minutes that are thirdhand—Mr. Martell reporting to the board, and they go to the secretary and they go in the minutes, and then they are reviewed and edited by however many lawyers—I think it's reasonable, certainly at this point, to credit Mr. Florance's unvarnished public statements.").

Plaintiff alleges that the Board—at Martell's behest—caused the Proxy Statement to make false statements and to omit material information regarding the Board's antitrust considerations and Martell's interest in post-Merger employment. As to the Board's antitrust considerations, the Complaint calls them "phony" and "pure malarkey" because the Board (i) "waited until December 2020" to raise antitrust concerns; (ii) provided "no explanation" for its antitrust concerns; (iii) failed to "retain" antitrust counsel; and (iv) failed to inform Company stockholders that CoStar was not a competitor.[71]

As to post-Merger employment, the Complaint alleges the Proxy Statement omitted that "high level executives" "would have likely lost their positions in a merger with CoStar."[72] By the same token, the Complaint alleges that the Proxy Statement omitted that management's post-Merger employment with Stone Point and Insight was "assured."[73] To support this position, the Complaint emphasizes that Stone Point and Insight retained management after the Merger closed.[74]

---

[71] *Id.* ¶¶ 81–88, 94.

[72] *Id.* ¶ 96.

[73] *Id.* ¶ 102.

[74] *Id.* ¶ 106.

16

Overlapping the employment category, the Complaint alleges that Martell had an undisclosed conflict of interest in entrenchment.[75] The Complaint alleges that Martell "spearheaded" the Company's sale process, while the "supine" Board deferred to "management['s]" interest in pursuing a deal that would guarantee their continued employment.[76] The Complaint alleges that, if the Board rejected CoStar, then Martell would have "received a change of control payment and kept his job."[77] Plaintiff thus reasons that Martell's severance pay *plus* his salary motivated him to steer the Company away from CoStar. As relief, Plaintiff seeks damages.

Martell has moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim. He argues that the Complaint fails under *Corwin* and, alternatively, fails to state a breach of fiduciary duty claim. Plaintiff opposes the motion.

As discussed below, the Complaint fails under *Corwin* because Plaintiff has not alleged a reasonably conceivable disclosure violation. And even without *Corwin*, the Complaint fails to state a claim for breach of the duty of loyalty because Plaintiff does not allege specific facts from which to reasonably infer that Martell self-interestedly prevented a CoStar deal. So I will dismiss the Complaint.

---

[75] *Id.* ¶¶ 96–106.

[76] *Id.* ¶¶ 5, 100.

[77] *Id.* ¶ 100 (emphasis omitted).

17

## II. LEGAL ANALYSIS

In considering a Rule 12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable inferences in favor of the non-moving party; and (4) denies dismissal if recovery on the claim is "reasonably conceivable."[78] The Court, however, need not accept "every strained interpretation of the allegations, credit conclusory allegations . . . [un]supported by specific facts, or draw unreasonable inferences in the plaintiff's favor."[79]

Plaintiff agreed to incorporate into the Complaint all the documents Plaintiff obtained from the 220 Action.[80] The parties have debated the extent to which those documents may be used to evaluate the pleading-stage sufficiency of the Complaint's allegations.

"The complaint generally defines the universe of facts that the trial court may consider in ruling on a Rule 12(b)(6) motion . . . ."[81] Still, the Court may look outside

---

[78] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[79] *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 716 (Del. 2020) (internal quotation marks and citations omitted).

[80] *See* Ex. 28 ¶ 11 (Confidentiality Agreement); *see generally United Techs. Corp. v. Treppel*, 109 A.3d 553, 558–59 (Del. 2014) (permitting such agreements).

[81] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

the complaint to consider "the content of documents that are integral to or incorporated by reference into the complaint."[82] "The trial court may also take judicial notice of matters that are not subject to reasonable dispute."[83] "The public policy behind these exceptions is plain: allegations largely predicated upon documents not presented to the Court in the pleadings should not escape the Court's review under Rule 12(b)(6) . . . ."[84]

Building on these principles, this Court has clarified the framework for determining whether a document is integral to a disclosure claim:

> Whether a document is integral to a claim and incorporated into a complaint is largely a facts-and-circumstances inquiry. This Court has recently determined that documents as varied in form as . . . a merger proxy statement, an SEC filing, . . . and an internal corporate [document] all can, depending on the relevant allegations of the complaint, be deemed integral to the claims and therefore be considered by the Court on a Rule 12(b)(6) motion . . . .

> [The] general tendency is that the Court may conclude a document is integral to the claim if it is the source for the facts as pled in the complaint . . . .

> In addition, this Court commonly considers extraneous documents, not for the truth of their contents, but to test the sufficiency of allegations for disclosure-based claims. For example, a stockholder may, in asserting that the directors improperly failed to disclose a material fact in advance of a stockholder vote, selectively quote or [mis]characterize the relevant proxy statement. In such

---

[82] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003).

[83] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020) (alteration and internal quotation marks omitted).

[84] *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

cases, this Court may consider the proxy statement as a whole, rather than merely the portions alleged in the complaint, to determine what information was disclosed.[85]

In short, "a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict[s] the complaint's allegations."[86]

To be sure, the incorporation-by-reference doctrine does not heighten the motion to dismiss standard. The doctrine does not permit a court to accept the truth of a matter asserted in an incorporated document.[87] Nor does it permit a court to resolve competing inferences in the movant's favor.[88] To the extent incorporated documents contradict an allegation, and the allegation is well-pleaded, the allegation controls. To the extent incorporated documents support competing inferences, and Plaintiff has made a well-pleaded allegation, Plaintiff is entitled to the inference.

---

[85] *Id.* at *3–4 (cleaned up); *accord Windsor*, 238 A.3d at 873 nn.43, 45.

[86] *Encorp*, 832 A.2d at 139 (first citing *In re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at *3 (Del. Ch. Sept. 1, 1992); and then citing *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[87] *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995) (cautioning, in the context of securities filings, that proxy statements are hearsay as to matters unrelated to disclosure). This rule does not apply if the plaintiff concedes the truth of a matter in the incorporated document. *See id.* at 69–70.

[88] *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *14 (Del. Ch. June 11, 2020).

Even so, the incorporation-by-reference doctrine allows a court to review an integral document as a whole "to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one."[89] Otherwise, "complaints that quoted only selected and misleading portions of such documents could not be dismissed . . . even though they would be doomed to failure."[90] Accordingly, when "a plaintiff chooses to refer to a document in its complaint, the Court may consider the entire document, even those portions not specifically referenced in the complaint."[91]

These principles promote efficiency.[92] And that is particularly true in a case following an inspection demand. Delaware law empowers stockholders to "request company books and records under Section 220 to attempt to substantiate their allegations" before pursuing fiduciary litigation.[93] Those documents, if referenced,

---

[89] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated in part on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[90] *Windsor*, 238 A.3d at 875 (internal quotation marks omitted).

[91] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *13 n.233 (Del. Ch. Dec. 18, 2017) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 4.06[b][2][i] (2016 ed.)). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("A plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (cleaned up)).

[92] *See Yahoo! Inc.*, 132 A.3d at 797 ("The [incorporation-by-reference] doctrine . . . enables courts to dispose of meritless complaints at the pleading stage.").

[93] *Cal. State Tchrs.' Ret. Sys. v. Alvarez*, 179 A.3d 824, 839 (Del. 2018).

"necessarily shape the range" and "outcomes" of pleading-stage inferences.[94] So do "public materials" referenced in the complaint, *e.g.*, securities filings.[95]

Here, Plaintiff brought a Section 220 action against the Company before filing this lawsuit. Through that action, Plaintiff obtained internal documents surrounding the Merger. Those documents are the source of the Complaint's allegations. So to the extent the Complaint references those documents, I may consider them "in their entirety rather than rely on the portions cherry picked" by Plaintiff.[96]

The Complaint is also based on "publicly available documents," including the Proxy Statement.[97] As a result, I may examine the entire Proxy Statement to "establish what was disclosed" to voting stockholders[98] and to contextualize

---

[94] *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 55 (Del. 2022).

[95] *Id.* at 54–55. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) ("On a motion to dismiss, the court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials[.]" (emphasis omitted)); *see also* D.R.E. 201(b)(2).

[96] *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *2 (Del. Ch. Aug. 24, 2020) (alteration and internal quotation marks omitted).

[97] *See, e.g.*, Compl. ¶¶ 87, 93; Compl. at 1–2 (averring that Plaintiff has drawn its allegations from "documents filed and/or published by [Martell or the Company], news reports, press releases, conference call transcripts, and other publicly available documents, as well as documents produced to Plaintiff in response to" the books-and-records action).

[98] *Abbey v. E.W. Scripps Co.*, 1995 WL 478957, at *1 n.1 (Del. Ch. Aug. 9, 1995) (Allen, C.); *accord Santa Fe*, 669 A.2d at 69.

22

Plaintiff's disclosure-based allegations.[99]   Consistent with the incorporation-by-reference doctrine, I also may consider the other documents to which Plaintiff refers to ensure they support the inference Plaintiff seeks.

Earlier in this decision, I recited the factual narrative as told by the Complaint. That narrative obscures or elides integral Section 220 documents and public filings that are referenced in or supplied the facts for the Complaint.  This approach runs contrary to the efficiency-based rationale animating pleading-stage review of complaints grounded on information obtained under Section 220.[100]   Properly situated, the Complaint must be dismissed for failure to state a claim.

---

[99] *See In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("In dismissing the disclosure claim, the Court of Chancery considered the entire proxy statement, not just the portions cited in the plaintiffs' complaint.  The Delaware Supreme Court agreed that the court properly considered the proxy statement for this purpose . . . ." (citing *Santa Fe*, 669 A.2d at 69)).

[100] *See GGP*, 282 A.3d at 54 n.84 ("Delaware's system affirmatively encourages reliance on factually specific pleadings as a basis for substantive evaluation of shareholder litigation at an early stage of the proceedings . . . . [T]he Delaware system provides or depends on mechanisms that enable and encourage the plaintiff and the defendants as well to supply relevant information that meaningfully assists the courts in improving the fairness and utility of that substantive, pleading stage evaluation." (quoting Lawrence A. Hamermesh & Michael L. Wachter, *The Importance of Being Dismissive: The Efficiency Role of Pleading Stage Evaluation of Shareholder Litigation*, 42 J. Corp. L. 597, 603 (2017))).

## A. The Complaint Fails To Plead A Disclosure Violation

"Delaware corporate law grants significant deference to the votes of disinterested stockholders."[101] Indeed, "the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[102] As a result, "there is little utility in a judicial examination of fiduciary actions ratified by" an uncoerced and fully informed majority of disinterested stockholders.[103] Under those conditions, "there is no agency problem for a court to review[.]"[104]

Synthesizing these principles, the Delaware Supreme Court in *Corwin* held that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of disinterested stockholders, the business judgment rule applies."[105] "The practical effect of *Corwin* cleansing is that when the doctrine applies, a lawsuit that challenges a transaction as a breach of fiduciary duty is subject

---

[101] *Hawkins v. Daniel*, 273 A.3d 792, 808 (Del. Ch. 2022), *aff'd*, --- A.3d ----, 2023 WL 115854 (Del. Jan. 6, 2023).

[102] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 312–13 (Del. 2015).

[103] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *2 (Del. Ch. May 31, 2017).

[104] *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *1 (Del. Ch. Aug. 31, 2020), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021) (TABLE).

[105] *Corwin*, 125 A.3d at 309.

to dismissal at the pleading stage."[106] Absent waste, *Corwin*'s version of the business judgment rule has been described as "irrebuttable."[107]

The Complaint does not allege that the Merger is subject to entire fairness review,[108] that the approving stockholders were not disinterested, or that the vote was coerced. So the Complaint must be dismissed under *Corwin* unless the Complaint supports a reasonable inference that the vote was not fully informed.

A stockholder vote is fully informed if the corporation's disclosures "apprised stockholders of all material information and did not materially mislead them."[109] A fact is material "'if there is a substantial likelihood that a reasonable [stock]holder would consider it important in deciding how to vote.'"[110] "The test does not require a substantial likelihood that the disclosure would have caused the reasonable

---

[106] *Goldstein v. Denner*, 2022 WL 1671006, at *19 (Del. Ch. May 26, 2022).

[107] *See In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 737 & n.16 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE); *see also Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016) (ORDER) ("[T]he vestigial waste exception has long had little real-world relevance, because . . . stockholders would be unlikely to approve a transaction that is wasteful." (citations omitted)).

[108] Although the Complaint calls the Board "supine," Compl. ¶ 4, that bare allegation is insufficient to elevate the standard of review to entire fairness, *see In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *34 (Del. Ch. May 6, 2021).

[109] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

[110] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

investor to change his vote . . . ."[111]  Instead, "there must be a substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[112]  To plead a disclosure violation, "a plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder."[113]

"Material" does not mean "everything."  Delaware law requires stockholders to be fully informed, not "infinitely informed."[114]  Determining the materiality of an alleged omission or misstatement "requires a careful balancing of the potential benefits of disclosure against . . . the risk of information overload[.]"[115]  As Vice Chancellor Zurn recently explained:

> Delaware courts are cautious in balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information.  Counterbalancing the mandate for complete disclosure . . . is recognition of the risk of inundating the stockholder with so much information that the proxy clouds, rather than clarifies, the

---

[111] *Goldstein*, 2022 WL 1671006, at *19 (cleaned up).

[112] *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus.*, 426 U.S. at 449).

[113] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).

[114] *In re Merge Healthcare Inc.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017).

[115] *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch. 1999) (internal quotation marks and citations omitted), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

stockholder's decision. A complaint does not state a disclosure violation by noting picayune lacunae or "tell-me-more" details left out.[116]

Consistent with these principles, "[o]mitted facts are not material simply because they might be helpful."[117] Nor is an omitted fact material if it would have "closed a circle" or made a disclosure "somewhat more informative."[118] "So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment."[119]

One disclosure violation is enough to defeat *Corwin*.[120] At the pleading stage, the operative question is whether the complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[121] The plaintiff bears the initial burden to identify a

---

[116] *Teamster Members Ret. Plan v. Dearth*, 2022 WL 1744436, at *12 (Del. Ch. May 31, 2022) (internal quotation marks and citations omitted), *aff'd*, 2023 WL 125659 (Del. Jan. 9, 2023) (TABLE). *See Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del. Ch. June 12, 1995) (Allan, C.) ("[T]he law ought [to] guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure. In some instances[,] the opposite will be true."), *aff'd*, 681 A.2d 1050 (Del. 1996).

[117] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

[118] *Kahn v. Lynch Commc'n Sys.*, 669 A.2d 79, 89 (Del. 1995) (cleaned up).

[119] *In re Match Gp., Inc. Deriv. Litig.*, 2022 WL 3970159, at *27 (Del. Ch. Sept. 1, 2022) (internal quotation marks omitted).

[120] *See In re Mindbody, Inc.*, 2020 WL 5870094, at *26 (Del. Ch. Oct. 2, 2020).

[121] *Morrison*, 191 A.3d at 282.

27

"deficiency in the operative disclosure document[.]"[122]  Only then does the burden shift to the defendant to "establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[123]

### 1.  The Disclosures Regarding The Board's Antitrust Considerations

The Complaint alleges four deficiencies that, in Plaintiff's view, render the Proxy Statement's antitrust disclosures false.  None does.

#### a.  The Alleged December 2020 Delay

The Complaint first alleges that the Proxy Statement's antitrust disclosures must be false because, according to Plaintiff, the Board did not raise antitrust concerns until December 2020.  This allegation is contradicted by the Proxy Statement.  Although omitted from the Complaint, the Proxy Statement disclosed that the Board's antitrust concerns arose *before* December 2020.  In July 2020, the Board rejected the Funds' tender offer, in part, because of "regulatory concerns raised by" the Funds' "relationships with competitors."[124]  Plaintiff concedes that

---

[122] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017).

[123] *Id.*

[124] Proxy Statement at 39.  The Complaint cites only on the Board's determination that the Funds' proposal "significantly undervalued" the Company.  *See* Compl. ¶¶ 34, 40.

"regulatory" and "antitrust" are used interchangeably throughout the Proxy Statement.[125] The nexus to "competitors" dispels lingering doubt.

Moreover, any purported "delay" in discussing antitrust with CoStar is no mystery. CoStar did not make its initial bid until December 2020.[126] So the Board had no reason to raise antitrust concerns with CoStar until then. Similarly, the Board had no reason in December to use antitrust as a ploy to prefer Stone Point and Insight. Stone Point and Insight did not make a joint bid until February 2021.

Neither the Complaint, itself, nor the Proxy Statement supports the delay allegation. Accordingly, the delay allegation does not support a reasonable inference that the antitrust disclosures are false.

### b. The Alleged Failure To Explain

The Complaint next alleges that the Proxy Statement must be false because it provides "no explanation" for the Board's antitrust concerns.[127] It does.

For example, the Proxy Statement disclosed that CoStar proposed to extend the target closing date to 15 months to account for regulatory scrutiny.[128] Similarly,

---

[125] *See* Tr. at 69:17–20.

[126] Proxy Statement at 47. As discussed later in this decision, the Federal Trade Commission commenced proceedings to block a separate CoStar acquisition in late 2020.

[127] Compl. ¶ 88.

[128] *E.g.*, Proxy Statement at 54–59. *See also* Ex. 14 (Feb. 3, 2021 Bd. Minutes); Ex. 25 (Competing Proposal); Ex. 26 (Revised Competing Proposal).

the Proxy Statement disclosed that on December 18, the Board sought "certainty of closing" from CoStar due to issues with "antitrust approval."[129]

As pleaded, it is not reasonably conceivable that the Company's disclosures regarding this concern were false. For one thing, CoStar's December 15 bid made "regulatory approval" from the "U.S. antitrust authorities" "in particular" a "material condition" to closing.[130] CoStar reasserted this position in January.[131]

For another, CoStar was facing antitrust-related liability in another deal at the time. Although styled by the Complaint as an exposé, the Bisnow Article primarily discussed the impact of domestic antitrust policy on CoStar's 2020-2021 acquisition efforts. Relevant here, the Bisnow Article reported that the Federal Trade Commission sued CoStar in late 2020 to block a merger between CoStar and another company.[132] The litigation reportedly resulted in a payment of a $59.5 million reverse termination fee to the target, which CoStar, quite notably, disputed and then eventually paid in February 2021.[133]

---

[129] Proxy Statement at 47.

[130] Ex. 20 at 2 (CoStar Initial Bid).

[131] *See* Ex. 21 (CoStar Revised Bid).

[132] Bisnow Article (referencing Compl. for TRO and Prelim. Inj., *FTC v. CoStar Gp., Inc.*, 2020 WL 7137249 (D.D.C. Dec. 3, 2020) (No. 1:20-cv-03518-JDB)).

[133] *Id.* (citing Dees Stribling, *Redfin Pays $608M for RentPath After FTC Foils CoStar's Bid*, Bisnow (Feb. 19, 2021), https://www.bisnow.com/national/news/multifamily/redfin-ponies-up-608m-to-buy-rentpath-107812; John Banister, *CoStar's Revenue Grew 19%*

The Board knew all this. It discussed the enforcement action and CoStar's fee dispute during a February 2, 2021, meeting.[134] Consistent with the Board's review, the Proxy Statement disclosed that, on February 2,

> the Board discussed the regulatory-related terms proposed by CoStar, the potential risks that regulatory authorities would propose a remedy in order to approve a combination with CoStar, the scope of such a remedy, the timing of such a process and the risk that CoStar would not take the actions necessary to obtain regulatory approval.[135]

Having carefully considered the allegations in and materials integral to the Complaint, it is not reasonably conceivable that, as pleaded, the Board's antitrust concerns were pretextual.

To advance a contrary interpretation of the Proxy Statement, Plaintiff relies on commentary from a Morningstar analyst. The Bisnow Article reported that the analyst was "skeptical" that a deal between CoStar and the Company would have "present[ed] antitrust risk."[136] The analyst acknowledged the Company's views, but thought they were not "substantiate[d]."[137]

*Last Year As CRE Shifted Operations Online*, Bisnow (Feb. 24, 2021), https://www.bisnow.com/national/news/technology/costars-revenue-grew-19-last-year-as-cre-shifted-operations-online-107869).

[134] Ex. 13 at 3 (Feb. 2, 2021 Bd. Minutes).

[135] Proxy Statement at 55.

[136] Bisnow Article.

[137] *Id.*

Based on these comments, Plaintiff reasons that the Board's antitrust concerns were false. But the Proxy Statement disclosed that the Board developed its antitrust considerations from information received from its advisors. And the Complaint does not allege that those advisors were conflicted or provided the Board with incomplete or misleading information. The Proxy Statement was not required to disclose all the details and underlying assumptions driving Evercore and Skadden's analyses and recommendations.[138] The Proxy Statement also was not required to disclose the opinions of an analyst who did not advise the Board.[139] In this case, all that matters is whether the Board considered the matters the Proxy Statement disclosed. It did.

Plaintiff next faults the Proxy Statement's background section for using the word "antitrust" only a handful of times.[140] But again, Plaintiff conceded that the Board used "antitrust" and "regulatory" interchangeably. And it does not point to

---

[138] *See In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 900–01 (Del. Ch. 2016); *see also In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) ("[Q]uibbles with a financial advisor's work . . . cannot be the basis of a disclosure claim.")

[139] *See In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1132 (Del. Ch. 2011); *In re MONY Gp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004).

[140] Compl. ¶ 93.

any precedent requiring disclosures to use "magic words." In this context, then, failure to use the word "antitrust" more frequently makes no difference.[141]

The Proxy Statement's background section provides a summary and a "summary" is just that: a summary. It need not disclose everything.[142] Nor should it. At a certain point, disclosure "becomes an exercise in diminishing returns."[143] Indeed, "[o]ur disclosure jurisprudence is conscious of the risks of overdisclosure" and so does not require fiduciaries to unleash "an avalanche of trivial information" on stockholders.[144] Antitrust permeated the Proxy Statement, whether in name or by synonym. There was no need to recite it repeatedly.[145]

Labeling the Board's antitrust concerns as "vague" fares no better.[146] In *Cogent*,[147] for example, target stockholders argued that the board's antitrust concerns

---

[141] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *11 (Del. Ch. June 30, 2014) ("[T]he question of materiality under Delaware law is a context-specific inquiry, and . . . differs from merger to merger." (internal quotation marks omitted)).

[142] *See Trulia*, 129 A.3d at 900–01.

[143] *Wayne Cnty. Emps.' Ret. Sys. v. Corti*, 954 A.2d 319, 330 (Del. Ch. 2008) (internal quotation marks omitted).

[144] *Morrison*, 191 A.3d at 283 n.65 (internal quotation marks omitted).

[145] *See Miami Gen. Emps. v. Comstock*, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016) ("Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing.").

[146] Compl. ¶ 92.

[147] *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487 (Del. Ch. 2010).

33

were pretextual because the board "merely perceived" antitrust risks.[148] The court, however, observed that the board disclosed all its considerations, included that the rejected bidder "had not addressed the regulatory risks of a merger" to the board's satisfaction.[149] "Given the number and magnitude of the other reasons cited by [the board] as to why [the rejected bidder] did not present a favorable option," the court found that the board's antitrust concerns—however small—were legitimate bases for accepting an offer that would not be complicated by regulatory scrutiny:

> The need for potential regulatory approvals relating to antitrust considerations presents a legitimate risk factor for the Board to consider in determining whether a proposed transaction would maximize stockholder value. If regulatory approval is denied or drawn out in a costly delay, then a higher bid price does not necessarily mean a greater return for stockholders.[150]

So too here. The Complaint and Proxy Statement detail the Board's concern with antitrust scrutiny and its impact on closing speed. The Board also considered CoStar's issues with antitrust litigation and disputes over its obligation to pay a deal-termination fee. Under these circumstances, it is not reasonably conceivable that the Board—let alone Martell—fabricated a regulatory basis for choosing the Merger, which contained strong antitrust assurances, over CoStar's offers, which did not.

---

[148] *Id.* at 511.

[149] *Id.* at 512.

[150] *Id.*

In any event, Plaintiff's objection is beside the point. "Delaware law does not require that a fiduciary disclose its underlying reasons for acting."[151] As a result, "asking 'why' does not state a meritorious disclosure claim."[152] And "it is not enough . . . to pose questions that are not answered in the proxy statement" either.[153] Instead, the Complaint "must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury."[154] It does not. The no-explanation allegation fails to support a reasonable inference that the Board falsified the Proxy Statement.

### c. The Alleged Failure To Retain Antitrust Counsel

The Complaint next had alleged that the Proxy Statement's disclosures must be false because the Board failed to retain antitrust counsel. Martell, who is represented by Skadden, observed otherwise.[155] Plaintiff commendably abandoned

---

[151] *Sauer-Danfoss*, 65 A.3d at 1130. *See Match Gp.*, 2022 WL 3970159, at *32 ("Disclosures relating to the Board's subjective motivation or opinions are not *per se* material, as long as the Board fully and accurately discloses the facts material to the transaction." (alteration and internal quotation marks omitted)).

[152] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1001 (Del. Ch. 2014) (alteration omitted) (quoting *Sauer-Danfoss*, 65 A.3d at 1131), *aff'd sub nom. Corwin*, 125 A.3d 304.

[153] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[154] *Corti*, 954 A.2d at 330 (alteration omitted) (quoting *Skeen*, 750 A.2d at 1173).

[155] Dkt. 11 at 17 n.5 (Def.'s Opening Br. in Supp. of Mot. to Dismiss) ("Opening Br.").

the allegation.[156]  Still, during oral argument, Plaintiff contended that "nothing in the [Proxy Statement] or in the [Board] minutes ever say[s] that the [B]oard was specifically briefed about antitrust issues by counsel."[157]  But this was not alleged in the Complaint or raised in Plaintiff's brief.[158]  So Plaintiff's argument is waived.[159]

### d.  The Allegation That CoStar Is Not A Company Competitor

Finally, the Complaint alleges that the Proxy Statement must be false because CoStar was not a Company competitor.  To support this allegation, Plaintiff cites the Company's 2020 Form 10-K, which did not list CoStar as a competitor.

Plaintiff cites no authority for the proposition that antitrust concerns cannot exist in an M&A setting unless a potential counterparty has been formally

---

[156] *See* Tr. at 68:19–22.

[157] *Id.* at 68:23–69:1.

[158] *Compare id.*, *with* Compl. ¶ 88 ("[The Company] apparently failed to take any active steps *to retain counsel* that specialized in [antitrust] to help analyze whether any such 'concerns' had any validity." (emphasis added)), *and* Opp'n Br. at 38 ("[T]here was also no indication that any . . . experts were *retained to assess* the [antitrust] claim—including any experts from the antitrust department of [Skadden]." (emphasis added)).

[159] *See Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242–43 (Del. 2004). Although waiver is dispositive, I note that Plaintiff's oral allegation would seem to require the Board to admit it was not fully informed of antitrust issues.  Delaware law, though, does not require the Board to make "self-flagellating" disclosures.  *See, e.g., Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992); *accord Loudon*, 700 A.2d at 143.  My analysis is likely further colored by the fact that Kenneth Schwartz, an antitrust partner at Skadden, attended four Board meetings between January and February 2021.  *See* Opening Br. at 17 n.5; *see also* Exs. 4, 13–14, 17 (Bd. Minutes).  Plaintiff's counsel was apparently unaware of this fact until oral argument.  *See* Tr. at 68:20–22.  Hence, Plaintiff's concession.

denominated as a competitor in a prior SEC filing. In fact, the opposite seems true. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'"[160] In other words, "antitrust laws protect consumers, not competitors."[161] Consistent with these objectives, the Proxy Statement disclosed that the Board was concerned with the impact of a CoStar deal on customers and, most importantly, how regulators would view that impact.[162] And the Proxy Statement disclosed that CoStar was a strategic bidder, with all that entails. Taken together, the absence of pre-Merger disclosures formally designating CoStar as a competitor neither undermines the Board's "reasonable assumption" that a CoStar merger could draw regulatory scrutiny, nor gives rise to a disclosure violation.[163]

Even so, the Proxy Statement incorporated the 2020 10-K by reference.[164] And stockholders were provided with a hyperlink to it under a heading titled "Where

---

[160] *Brooke Gp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (emphasis omitted) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

[161] *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 387 (3d Cir. 2005) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977)), *cert. denied*, 547 U.S. 1020 (2006). *See* Frank H. Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 138 (1984) (Antitrust law was enacted "to protect consumers from overcharges and the economy as a whole from harm."); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription.'" (quoting Robert H. Bork, *The Antitrust Paradox* 66 (1978))).

[162] Proxy Statement at 50.

[163] *Match Gp.*, 2022 WL 3970159, at *27 (internal quotation marks omitted).

[164] *See* Proxy Statement at 122.

37

You Can Find More Information."[165]  So any absence of CoStar on the 2020 10-K's "competitor" list *was* disclosed, in the place one would expect to look for such information.

Nor is it "a *per se* disclosure violation to disclose information in public filings incorporated in the proxy instead of the proxy itself."[166]  Where, as here, a document referenced in a proxy statement is "explicitly incorporated" and not "buried" such that "a reasonable stockholder reading the [proxy statement] could find it without difficulty," it is considered "to be a part of the total mix of information available to stockholders."[167]  The Proxy Statement was not required, in this instance, to make a redundant, affirmative disclosure specifically flagging the absence of a competitor-designation in the Company's incorporated and readily available public filings.

Given all this, it appears that this allegation is really a hair-splitting critique of the Board's regulatory analysis. A mere disagreement with the Board's sale

---

[165] *Id.* (embedding link to CoreLogic, Inc., Annual Report (Form 10-K) (Mar. 1, 2021)).

[166] *Match Gp.*, 2022 WL 3970159, at *28 n.254 (first citing *Galindo v. Stover*, 2022 WL 226848, at *9 (Del. Ch. Jan. 26, 2022); and then citing *Wolf v. Assaf*, 1998 WL 326662, at *3 (Del. Ch. June 16, 1998)).

[167] *In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at *15 & n.72 (Del. Ch. May 11, 2017) (internal quotation marks omitted).  *See Bren v. Cap. Realty Gp. Senior Hous., Inc.*, 2004 WL 370214, at *9 (Del. Ch. Feb. 27, 2004) (explaining, in the context of public filings, that "all material information that was previously disclosed [need not] be disclosed again with the specific correspondence requesting action").

38

considerations "cannot be recast as a disclosure claim."[168]  To the extent Plaintiff suggests that the Board misapprehended antitrust risk posed by a deal with CoStar, the Proxy Statement was not required to disclose what Plaintiff now says was the Board's error.[169]  To the extent Plaintiff suggests that the Board's antitrust analysis was incomplete, the Proxy Statement was not required to disclose what the Board did not consider.[170]

In a last gasp, Plaintiff adopts CoStar's position that a deal with CoStar would have presented "no meaningful antitrust concerns."  But "no *meaningful* antitrust concerns" does not reasonably mean "no antitrust concerns."  Indeed, in its competing bids, CoStar extended the closing deadline to accommodate antitrust review.[171]  I am not required to accept Plaintiff's strained interpretations of the facts alleged.  This allegation—and all the others—fail to support a disclosure violation.

---

[168] *Dearth*, 2022 WL 1744436, at *18 (internal quotation marks omitted).  *See MONY Gp.*, 853 A.2d at 682 ("[P]roxy materials are not required to state . . . legal theories or plaintiff's characterization of the facts." (internal quotation marks omitted)).

[169] *See Loudon*, 700 A.2d at 143 ("[E]ven when material facts must be disclosed, negative inferences or characterizations of misconduct . . . need not be articulated.").

[170] *See Sauer-Danfoss*, 65 A.3d at 1132 ("Omitting a statement that the board *did not* do something is not material, because 'requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless.'" (quoting *Lukens*, 757 A.2d at 736)).

[171] *See, e.g.*, Ex. 26 (Revised Competing Proposal).

### e. The Effect of Florance's Statements

The Complaint alleged four deficiencies to undermine the Proxy Statement's antitrust disclosures. None of them states a disclosure claim. Perhaps recognizing this, Plaintiff insisted at oral argument that the Complaint, *combined with* Florance's statements, is sufficient to defeat *Corwin*.[172] It is not.

In the Bisnow Article, Florance was paraphrased as stating that he "believe[d] antitrust issues had nothing to do with [the Company's] decision to turn down [CoStar's] offer."[173] Florance's statement, without more, is a conclusion. I may "ignore conclusory allegations that lack specific supporting factual allegations."[174] In my view, given the circumstances here, Plaintiff was required to substantiate Florance's statement in some fashion with well-pleaded facts. It did not.

To reiterate, the Proxy Statement disclosed that the Board focused on antitrust risk before CoStar made an offer. The Proxy Statement also disclosed that CoStar itself raised antitrust concerns in its first offer. The Proxy Statement further disclosed that the Board requested antitrust assurances not only from CoStar, but also from Stone Point and Insight. Contemporaneous Board minutes reflect, and Plaintiff does not dispute, that the Board actually had antitrust discussions with its

---

[172] *See, e.g.*, Tr. at 31:14–17, 32:3–5, 62:3–63:3, 79:10–80:1, 80:15–19.

[173] Bisnow Article.

[174] *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998).

unconflicted advisors and took notice of CoStar's antitrust lawsuit and related fee dispute. Florance's statement is unambiguously contradicted and does not save the Complaint.

Undeterred, Plaintiff points to Florance's paraphrased remark that the Board's (purportedly fake) antitrust concerns caused the Company to "turn down" CoStar.[175] Based on this language, Plaintiff contends that (purportedly fake) antitrust concerns "prevented" a CoStar deal.[176] This position is undermined by CoStar—and Florance's—own statements.

Recall that the Complaint said the Board "rejected" CoStar on March 4.[177] But, on March 4, CoStar issued a public press release (the "Press Release") announcing that *CoStar*—not the Board—terminated sale discussions.[178] And CoStar did not cite antitrust concerns as the deal-breaker either. Instead, the Press Release explained that "rising interest rates . . . [in] the mortgage refinancing market" were likely to "negatively impact valuations for residential property technology companies."[179] This caused CoStar to "change its view of [the

---

[175] Bisnow Article.

[176] Compl. ¶ 83.

[177] *Id.* ¶ 4.

[178] CoStar Gp., Inc., Current Report (Form 8-K) (Mar. 4, 2021) ("Press Release").

[179] *Id.*

Company's] value."[180]  Nevertheless, CoStar praised the Company and its sale process.  In the Press Release, CoStar called the Company "an excellent company with a talented team."[181]  Even *Florance* added his own words of congratulations:

> We wish to congratulate [Stone Point and Insight] on [the Merger] . . . . We thank [the] Board and management team . . . and congratulate them on achieving a strong valuation for [the Company's] [stock]holders.[182]

Plus, Plaintiff's theory suggests that antitrust was the sole focus of the CoStar negotiations.  It was not.  As the Proxy Statement disclosed, the Board also aimed for a deal that offered a substantial premium with cash value certainty on a prompt closing timeline:

- On December 18, 2020, the Board met with Evercore and Skadden to assess CoStar's initial bid.  The Board compared the value certainty of an equity transaction with the value certainty of a cash transaction.[183] Based on that analysis, the Board determined that a cash transaction would be preferable to a stock transaction.[184]

- On January 19, 2021, the Board met with Evercore and Skadden to assess CoStar's revised bid.  Among other things, the Board considered: (i) the absence of cash consideration or other price protection for volatility in CoStar's stock price; (ii) that CoStar would have no obligation to accept any structural, behavioral, or other remedies to obtain regulatory approval for the transaction; and (iii) that the bid

---

[180] *Id.* (cleaned up).

[181] *Id.*

[182] *Id.*

[183] Proxy Statement at 47.

[184] *Id.* at 47–48; Ex. 1 at 3 (Dec. 18, 2020 Bd. Minutes).

contemplated an outside date of nine months from signing, plus two 90-day extensions at CoStar's option.[185]

- On February 2, 2021, the Board met with its advisors to assess CoStar's "best and final offer."[186] The Board considered: (i) the offer's price structure and regulatory terms; (ii) the potential risks and consequences of an antitrust challenge; (iii) the timing of a federal review process; and (iv) the risk that CoStar would not take actions necessary to obtain regulatory approval.[187]

- On February 3 and 4, the Board met with its advisors to consider the advantages and disadvantages of the competing bids. The agenda included: (i) the risks in the valuation of CoStar stock as compared to cash; (ii) the risks and opportunities of obtaining synergies in a combination with CoStar; (iii) regulatory risk; (iv) the proposed terms of each bidder to address regulatory risk; and (v) the timing and certainty of closing on each bid.[188] Relative to CoStar, the Board found that Stone Point and Insight's all-cash offer provided "certain value," more "regulatory certainty," and a shorter closing time.[189]

- On February 17 and 21, 2021, the Board met with its advisors to evaluate the Competing Proposal.[190] The Board indicated interest, noting that the Company was "prepared to pursue an all-stock transaction" at that time.[191] Still, the Board concluded that a cash component was necessary.[192]

---

[185] Proxy Statement at 50.

[186] *Id.* at 55–56.

[187] *Id.* at 56.

[188] *Id.* at 57; Ex. 14 (Feb. 3, 2021 Bd. Minutes).

[189] Proxy Statement at 57.

[190] *Id.* at 58–59; Exs. 16–17 (Feb. 17 and 21, 2021 Bd. Minutes).

[191] Proxy Statement at 58–59.

[192] *Id.*; *see also* Ex. 12 (Graphics on CoStar Historical Stock Performance).

- On March 3, 2021, the Board met with its advisors to evaluate the Revised Competing Proposal. The Board determined that, while the offer continued to be reasonably expected to result in a Superior Proposal, CoStar should include a substantial increase in the cash component and shorten its closing deadline to no more than 12 months.[193]

It is not reasonably conceivable that the Board's concerns were concocted. In considering CoStar's February 16 and March 1 bids, the Board assessed the volatility of CoStar's stock price. The Board and its advisors observed that, although high, CoStar's stock price had been declining steadily. For example, the Proxy Statement disclosed that, between February 12 and March 2, CoStar's stock price had declined from $939.76 to $762.80 per share.[194] The decrease represented a 19% drop or approximately $177 per share.[195] Based on the 19% decline, the Board learned that the implied value of the Revised Competing Proposal was $83.73 per share, including the $6 cash component—not the $90 per share that CoStar advertised.[196]

Still, the Board recognized that a CoStar deal would come with synergies. So the Board persisted. It wanted CoStar to "substantially increase" the cash

---

[193] Proxy Statement at 60; Ex. 18 (Mar. 3, 2021 Bd. Minutes).

[194] Proxy Statement at 59; Ex. 9 (Evercore Presentation on CoStar Stock Volatility); Ex. 12 (Graphics on CoStar Historical Stock Performance).

[195] Proxy Statement at 59; Ex. 9 (Evercore Presentation on CoStar Stock Volatility); Ex. 12 (Graphics on CoStar Historical Stock Performance).

[196] Proxy Statement at 59.

consideration to mitigate future volatility.[197]  It also wanted CoStar to reduce the 15-month closing date to no more than 12 months.[198]  Through March, the Board believed that CoStar had the ability to make a Superior Proposal.[199]   Rather than renegotiate, CoStar walked.

Given the timing and content of the CoStar negotiations, the Board's overall approach, and the Proxy Statement's disclosures, it is not reasonably conceivable that the Board's antitrust considerations "had nothing to do" with the Merger.[200]

Finally, it is worth reemphasizing here that Plaintiff brought the 220 Action before filing this lawsuit.  That investigation evidently did not uncover anything to support Florance's statements.  A plaintiff cannot then use the Rule 12(b)(6) pleading standard to distort reality to plead a follow-on breach of fiduciary duty claim.[201]  In the face of the 220 Action, Plaintiff has essentially asked me to infer, without any books-and-records support, that the Proxy Statement's disclosures (and, indeed, the Board's minutes) were contrived as part of what amounts to a grand

---

[197] *Id.* at 60.

[198] Ex. 18 (Mar. 3, 2021 Bd. Minutes); Proxy Statement at 60.

[199] Ex. 18 (Mar. 3, 2021 Bd. Minutes); Proxy Statement at 59–60.

[200] Bisnow Article.

[201] *See Morgan v. Cash*, 2010 WL 2803746, at *7 (Del. Ch. July 16, 2010) ("Rule 12(b)(6) analysis does not give this court license to conjure up a reality on behalf of the plaintiff[.]").

conspiracy. To be clear, I am not weighing the evidence. But I am also not required to "blindly accept" every allegation as true.[202] Plaintiff undertook the difficult task of claiming the Proxy Statement is false. The Bisnow Article, standing alone or combined with the Complaint, misses that mark.

In sum, the antitrust allegations fail to state a reasonably conceivable disclosure violation.

### 2. Martell's Interests In Post-Merger Employment

The Complaint alternatively alleges that the Proxy Statement omitted material information about Martell's interest in obtaining post-Merger employment. This theory does not support a claim either.

### a. Martell's Future Employment At Stone Point And Insight

The Complaint alleges that the Proxy Statement failed to disclose that Martell had conversations with Stone Point and Insight about post-Merger employment. The Complaint does not identify any document supporting this allegation. Instead, the Complaint speculates that, because Stone Point and Insight retained Martell after the Merger closed, it would be "preposterous to assume that there were no discussions with Stone Point [and] Insight concerning continued employment of management"

---

[202] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *accord White v. Panic*, 783 A.2d 543, 549 (Del. 2001).

46

during the sale process.[203]   The Complaint also points to a bit of conventional wisdom that financial buyers often retain target management post-closing.[204]

Precedent rejects Plaintiff's reasoning here.  In *English v. Narang*,[205] target stockholders alleged that a Recommendation Statement omitted material facts concerning "post-closing employment opportunities for [target] management."[206] The stockholder-plaintiffs had no evidence that those discussions occurred.  Instead, they theorized that those employment discussions with the acquiror—a financial buyer—were "likely" because (i) target management "knew" that the acquiror "routinely retains" existing management; and (ii) the acquiror, on the closing date, announced that it decided to retain some target managers.[207]  The plaintiffs further reasoned that employment discussions "must have occurred before closing" because the acquiror's announcement was filed on the same day that the acquisition closed.[208]

The court dismissed the complaint.  In doing so, the court first recited the rule that "if a disclosure document does not say the board or its advisors did something,

---

[203] Compl. ¶ 105.

[204] *Id.* ¶ 102.

[205] 2019 WL 1300855 (Del. Ch. Mar. 20, 2019), *aff'd*, 222 A.3d 581 (Del. 2019) (TABLE).

[206] *Id.* at *12.

[207] *Id.*

[208] *Id.*

then the reader can infer that it did not happen."[209] That in mind, the court next observed that the Recommendation Statement's background section did not discuss "the timing and extent of any discussions between [the target and acquiror] regarding post-close employment."[210] Given that absence, the court explained that the plaintiffs' theories would fail "unless plaintiffs allege[d] facts" suggesting that employment discussions "occurred during the sale process."[211]

They did not. Applying the governing framework, the court concluded that the plaintiffs' allegation was entirely speculative and missed the "key point" that stockholders are entitled to material information about events that happened "*during the sale process*," not "at some point after execution:"

> What is important . . . is whether discussions about post-close employment occurred before the Company agreed to do a deal with [the acquiror]. This is because the issue that could create a conflict of interest and be material to stockholders in deciding whether to tender their shares is whether a fiduciary of the Company . . . had a motive to play favorites *during the sale process* in order to secure post-close employment . . . .
>
> Based on the allegations of the Complaint, it would be speculative—rather than reasonable—to infer that such discussions occurred during the sale process simply because [the acquiror] has a reputation for retaining management. Put differently, the only non-speculative, reasonable inference that can be drawn from the Complaint's allegations is that post-close employment discussions occurred at some point after execution of the Merger Agreement and before the announcement in the Form 8-K filing issued on the

---

[209] *Id.* (alteration omitted) (quoting *Sauer-Danfoss*, 65 A.3d at 1132).

[210] *Id.*

[211] *Id.*

closing date. For the reasons explained above, however, such an omission from the Recommendation Statement would not be material . . . .[212]

*English* is dispositive. Like the stockholder-plaintiffs in *English*, Plaintiff bases its theory on a closing-date announcement and the idea that financial buyers retain management. Plaintiff does not allege facts suggesting that employment discussions with Stone Point and Insight occurred during the sale process. So Plaintiff seeks a speculative inference, not a reasonable one. I need not draw it.[213]

Moreover, like the Recommendation Statement in *English*, the Proxy Statement contains a background section that does not mention employment discussions with Stone Point and Insight. Consistent with the background, the Proxy Statement disclosed that, at the time of the stockholder vote, the Company's managers had not entered into an employment agreement with Stone Point and Insight.[214] Given that disclosure, the Proxy Statement was not required to additionally disclose that the Board or management did not have conversations about post-Merger employment.[215] If anything, the Complaint supports a reasonable

---

[212] *Id.* at *12–13 (first emphasis added) (cleaned up).

[213] *See Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1276 (Del. 1994) ("Delaware law does not require disclosure of . . . speculative information which would tend to confuse stockholders or inundate them with an overload of information.").

[214] Compl. ¶ 102; Proxy Statement at 82.

[215] *See Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) ("Consistent and redundant facts do not alter the total mix of information . . . .").

49

inference that Stone Point and Insight decided to retain Martell at some point after the sale process ended. As in *English*, any discussion that occurred at that point was not material.

To distinguish *English*, Plaintiff cites two cases: *In re Atheros Communications, Inc.*[216] and *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*[217] Both are inapposite.

In *Atheros*, target stockholders alleged that a proxy statement mischaracterized employment discussions between the acquiror and one of the target's inside directors. The proxy statement disclosed that the director "had not had any discussions [during the sale process] with [the acquiror] regarding the terms of his potential employment by" the acquiror.[218] But the director had discussed potential employment with the acquiror via e-mail during the sale process.[219] Given that discrepancy, the court preliminarily enjoined the stockholder vote, finding a reasonable probability that the plaintiffs stated a meritorious disclosure violation.

---

[216] 2011 WL 864928 (Del. Ch. Mar. 4, 2011).

[217] 11 A.3d 1175 (Del. Ch. 2010).

[218] *Atheros*, 2011 WL 864928, at *11.

[219] *Id.* The director also admitted in a deposition taken for the preliminary injunction hearing that he had intra-process employment discussions. *See id.* at *11 n.84.

The same was true in *Maric*. There, the proxy statement disclosed that a target CEO "did not negotiate terms of employment" with the acquiror during the sale process.[220] But the CEO discussed an equity compensation package with the acquiror during the sale process.[221] The court accordingly held that the proxy statement "created the materially misleading impression that management was given no expectations regarding" potential employment.[222]

This case is different. In *Atheros* and *Maric*, the stockholders had something more than speculation—communications, testimony—that employment discussions occurred between management and the acquiror during the sale process. To this extent, both cases are consistent with *English*. *English* dismissed the complaint because it did not offer the "something more"—communications, testimony—marshaled in *Atheros* and *Maric*. Here, by contrast, Plaintiff only offers Stone Point and Insight's announcement at closing. That is not enough.

The Court cannot infer the existence of undisclosed, intra-process employment discussions between a target executive and an acquiror from speculation and innuendo. Again, Plaintiff inspected the Company's books and records under Section 220 before filing this action. Plaintiff apparently did not

---

[220] *Maric*, 11 A.3d at 1179.

[221] *Id.*

[222] *Id.*

51

uncover the "something more" our law requires in this context. Either way, the Complaint does not support a reasonable inference that the Proxy Statement omitted discussions about Martell's future employment. Accordingly, this allegation fails.

### b. Martell's Future Employment At CoStar

The Complaint alternatively alleges the Proxy Statement failed to disclose that Martell would have been terminated if the Company merged with CoStar. As support for this allegation, the Complaint relies exclusively on the Bisnow Article. There, Florance was paraphrased as stating—after CoStar lost its public bid for the Company—that a CoStar deal would have caused "some" of the Company's "executives" to "los[e] their jobs."[223] The Bisnow Article directly quotes Florance as stating:

> Most of the senior management team there might earn eight digits a year of compensation, and in a merger, especially a strategic merger, inevitably some of those jobs go away . . . . That's a powerful motive to not do a deal.[224]

One major difficulty with accepting Florance's statements is that they are framed generically and seem to express a normative view about the consequences of strategic mergers that may or may not have been applicable to the factual

---

[223] Bisnow Article.

[224] *Id.*

circumstances surrounding this case.[225]  Another major difficulty with accepting Florance's statements is that none of the statements references Martell.  Yet another major difficulty with accepting Florance's statements is that the books and records that Plaintiff obtained do not support the inference that Florance or CoStar suggested Martell would be terminated during the sale process—quite the opposite.

The Complaint alleges that, during a January 17, 2021 Board meeting, Martell told the Board that "a potential future role for him in the surviving company was a topic of discussion between himself and [Florance]."[226]  That is only half the story. The January 17 meeting minutes report that Martell informed the Board that, during a call earlier that day, Florance told Martell that he "wanted [Martell] to play a significant role in the combined entity going forward."[227]  Two days later, Florance and CoStar delivered CoStar's January 19 bid letter, which stated that CoStar "envision[ed] ongoing and important roles for [Company] management."[228]  Less than one month later, Florance and CoStar reasserted, in CoStar's Competing

---

[225] At least one decision suggested that this view may be inapt where, as here, the strategic bidder makes representations about retaining target management.  *See In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *10 n.88 (Del. Ch. Jan. 31, 2013).

[226] Compl. ¶ 48 (referencing Ex. 6 (Jan. 17, 2021 Bd. Meeting Minutes)).

[227] Ex. 6 (Jan. 17, 2021 Bd. Minutes). According to the January 17 minutes, Martell responded that "his potential role in a combined company was not a consideration in determining whether to enter into any transaction with [CoStar] or any other party[.]" *Id.*

[228] Ex. 21 (CoStar Revised Bid).

Proposal, that CoStar "absolutely want[ed] to retain" the Company's "talented management team."[229]  CoStar reaffirmed this sentiment in the Press Release.[230] Florance echoed it.[231]

The Proxy Statement was not required to disclose a fact that "did not exist."[232] And I need not credit an allegation that is unambiguously contradicted by the documents integral to the Complaint's allegations.

My analysis here is perhaps colored by the fact that Plaintiff relies entirely on statements in an online article that, if anything, smack of post-process sour grapes. In any event, the Complaint, as pleaded, does not support Plaintiff's requested inference that Martell would have lost his job if the Company merged with CoStar.[233] So this alleged disclosure violation fails too.

---

[229] Ex. 25 (Competing Proposal).

[230] Press Release (The Company is an "excellent company with a talented team[.]").

[231] *Id.* ("We thank [the] Board and management team . . . and congratulate them on achieving a strong valuation for [the Company's] [stock]holders.").

[232] *In re JCC Hldg. Co.*, 843 A.2d 713, 721 (Del. Ch. 2003).

[233] The Complaint stresses that the Board proposed to CoStar "certain restrictions on employee retention efforts prior to closing." Compl. ¶¶ 51, 53. But it is unclear why that matters. A term that would have limited some operational changes during a transition period *pre-closing* does not support a reasonable inference that the Board required or even wanted CoStar to retain Martell *post-closing*. Accordingly, this term is irrelevant to my analysis.

Plaintiff has failed to identify an actionable deficiency in the Proxy Statement. *Corwin* therefore requires dismissal of the Complaint.

## B. The Complaint Fails To State A Breach Of Fiduciary Duty Claim

The Complaint fails under *Corwin*. But even in a pre-*Corwin* world, I would find that Plaintiff has failed to state a breach of fiduciary duty claim against Martell. The Complaint is devoid of specific facts from which to infer that Martell (improperly or otherwise) steered the Company away from CoStar.

### 1. The Applicable Standard

"The starting point for analyzing fiduciary action is to determine the correct standard of review."[234] Enhanced scrutiny presumptively applies to cash-out mergers.[235] In that setting, the board's goal is to "get the best price for the stockholders at a sale of the company."[236] *Revlon*, however, does not require that the board "actually attain[] the best immediate value."[237] After all, "there is no single blueprint that a board must follow to fulfill its [*Revlon*] duties."[238] "[A]t bottom[,]

---

[234] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021).

[235] *See, e.g.*, *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42–43, 45 (Del. 1994); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986).

[236] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (alteration and internal quotation marks omitted).

[237] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595 (Del. Ch. 2010).

[238] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989).

*Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[239]

Although enhanced scrutiny provides the standard of review, it does not govern the standard of conduct. "A court does not apply enhanced scrutiny when determining whether a fiduciary should be held liable" for damages.[240] Indeed, there is no "freestanding '*Revlon* claim'" for damages.[241] So a viable claim for damages "requires more [than] an allegation implying that [a fiduciary] failed to satisfy *Revlon*[.]"[242] It must also state a breach of an underlying fiduciary duty.[243]

The Company's charter contains a Section 102(b)(7) exculpatory provision applicable to directors.[244] As a result, the Complaint must be dismissed, "regardless of the standard of review[,]" unless it pleads a non-exculpated fiduciary duty

---

[239] *Dollar Thrifty*, 14 A.3d at 595–96.

[240] *Presidio*, 251 A.3d at 252.

[241] *USG*, 2020 WL 5126671, at *28.

[242] *Presidio*, 251 A.3d at 254 (internal quotation marks omitted).

[243] *See Malpiede*, 780 A.2d at 1083–84; *McMillan v. Intercargo Corp.*, 768 A.2d 492, 502 (Del. Ch. 2000).

[244] Compl. ¶ 22. It is not clear whether Plaintiff has sued Martell in his director or officer capacity. Because the Complaint fails under any title or theory, I disregard the distinction.

claim.[245]  Duty of loyalty claims cannot be exculpated.[246]  To plead a loyalty-based damages claim in the *Revlon* context, "the plaintiff must plead facts supporting a reasonable inference that the defendant failed to act reasonably to obtain the best transaction reasonably available, either due to interestedness, because of a lack of independence, or in bad faith."[247]

"[T]he paradigmatic *Revlon* claim involves a conflicted fiduciary who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value."[248] Martell does not fit this mold.

## 2.  The Allegations Challenging the Sale Process

Plaintiff alleges that "Martell spearheaded the sale process," "personally convinced the ['supine'] Board to proceed" with the Merger, and "was motivated"

---

[245] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015).

[246] Plaintiff also has attempted to allege a breach of the duty of good faith.  *See* Compl. ¶¶ 110–14.  I summarily reject this claim, however, because the Complaint does not allege any "extreme set of facts" suggesting Martell "knowingly and completely failed" to obtain the best price for the stockholders.  *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014) (internal quotation marks omitted).

[247] *Presidio*, 251 A.3d at 254.

[248] *Mindbody*, 2020 WL 5870084, at *13.

to do so by an undisclosed "self-interest" in his continued employment and executive pay.[249] These allegations fail to state a claim for breach of fiduciary duty.

None of the Board's 11 outside directors is alleged to be conflicted. None of those directors is alleged to have been beholden to Martell. Three of them, in fact, were nominated by entities in connection with a proxy contest. Plaintiff's allegation that three directors recently elected during a proxy fight were "supine" is not only conclusory, but, frankly, strains belief.[250]

---

[249] Compl. ¶¶ 4–5, 100; Opp'n Br. at 1–2.

[250] *See, e.g.*, Gregory H. Shill, *The Independent Board As Shield*, 77 Wash. & Lee L. Rev. 1811, 1861–62 (2020) ("Managers often have the capability and incentive to filter and shape the presentation of information for director consumption . . . . Directors nominated by activist shareholders are less vulnerable . . . . Such directors—known as designated or activist directors—usually qualify as independent . . . but are less information-poor than other outside directors because they can call upon the assistance of staff at the fund that facilitated their appointment." (citations omitted)). *See also In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *13 (Del. Ch. Oct. 1, 2015) (noting "skepticism" of claim that directors nominated by a large target stockholder, even if "beholden" to the stockholder, would be incented to select a sale proposal less valuable than the one chosen); *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 122 (Del. Ch. 2011) (finding reasonableness of takeover response was "bolstered" by the fact that activist directors on the target board agreed that the takeover response was appropriate); *Venhill Ltd. P'Ship v. Hillman*, 2008 WL 2270488, at *25 (Del. Ch. June 3, 2008) (Strine, V.C.) (observing that "outside advisors . . . help check the potential that [a] conflicted party's personal motivations will cause the consummation of a transaction that should have been avoided or, at the very least, been priced much differently"); *see generally In re Williams Cos. S'holder Litig.*, 2021 WL 754593, at *29–30 (Del. Ch. Feb. 26, 2021) ("Activists may pressure a corporation to make management changes, implement operational improvements, or pursue a sale transaction . . . . Many forms of stockholder activism can be beneficial to a corporation . . . ."), *aff'd sub nom. Williams Cos. v. Wolosky*, 264 A.3d 641 (Del. 2021) (TABLE).

Nor does the Complaint challenge the Board's advisors. None of those advisors is alleged to be conflicted. None of those advisors is alleged to have been beholden to Martell. None of those advisors is alleged to have provided inaccurate or irrelevant information. Together with its unconflicted advisors, the concededly independent Board sought to minimize the regulatory and closing risks inherent to antitrust scrutiny. It concluded that cash consideration was generally preferable to stock. And it preferred to close a deal promptly rather than be subject to an extended, uncertain closing process. All these considerations were disclosed. And these considerations were applied to all bidders.[251]

In all this, Martell is nowhere to be found. He is not alleged to have introduced the Board's antitrust concerns. He is not alleged to have recommended cash. And he is not alleged to have pushed for a quick closing. The Complaint's conclusory allegations concerning Martell's involvement do not support a reasonable inference that Martell improperly tilted the playing field in favor of Stone Point and Insight or otherwise wrote the script for the Board's negotiations or choreographed CoStar's decision to walk.

---

[251] *See* Proxy Statement at 57; *see also* Ex. 23 at 3.

True, Martell communicated with Florance and updated the Board. But the Complaint portrays Martell—who is often group-pleaded with "management"[252]— as another member of the negotiation team. There is no well-pleaded allegation that Martell "personally convinced" the concededly independent Board to do anything. By the same token, there is no well-pleaded allegation that he "spearheaded" the sale process. The Board did.

To make something out of nothing, the Complaint presses Martell's compensation package. It says that salary incentives, coupled with a golden parachute, caused Martell to "control the Company's strategy."[253] But the Complaint acknowledges that those benefits would have been realized in a CoStar deal too.[254] So they could not have motivated Martell one way or the other.[255]

---

[252] Compl. ¶¶ 5–7.

[253] *Id.* ¶ 100.

[254] *Id.* ¶ 75. *See also* Tr. at 37:12–18 ([Pl.'s Couns.]: "[Martell] stood to receive roughly the same under a Stone Point[-Insight] transaction or a CoStar transaction in terms of the mechanics of the golden parachute . . . . I think we calculated that he might get a few million dollars more in a CoStar deal than . . . the [M]erger.").

[255] *See Lukens*, 757 A.2d at 730 ("More importantly, the Complaint does not challenge the validity or enforceability of the 'golden parachute' contracts and acknowledges that Allegheny was prepared to enter into a merger agreement *substantially identical* to the Bethlehem merger agreement. I infer from this that Allegheny was also willing to honor the golden parachute payments. In the circumstances, there is simply no basis for inferring that directorial approval of a transaction providing for their payment was the product of disloyalty or bad faith." (emphasis in original) (cleaned up)), *aff'd sub nom. Walker*, 757 A.2d 1278; *see also Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *12 (Del. Ch. Dec. 10, 1998).

Moreover, the Proxy Statement disclosed Martell's potential pecuniary interests in the Merger.[256] The stockholders approved the Merger anyway.[257] Assuming the (contradicted) allegation that CoStar would have fired Martell is true, the extra salary he would obtain at Stone Point and Insight is not well-pleaded to be the wheel that steered the Company away from CoStar.

The Complaint last highlights the implied-value differential between the Merger price and the Revised Competing Proposal. The Complaint insists the Board would have taken the latter had Martell not been pulling the strings. And the Board's failure to do so, Plaintiff says, appropriately states a claim under our *Revlon*-precedent against Martell. It does not.

"Delaware law empowers directors to consider whether, under the circumstances, 'stock or other non-cash consideration' is preferable to cash when evaluating a proposal."[258] Here, the Board countered the Revised Competing Proposal for at least two reasons. First, rather than resolving the Board's antitrust

---

[256] Proxy Statement at 78–83.

[257] *Cf. Goldstein*, 2022 WL 1671006, at *19 ("[T]he version of the business judgment rule that applies post-*Corwin* cannot be rebutted based on director-level conflicts that were disclosed to stockholders."); *USG*, 2020 WL 5126671, at *2 ("[A] bribe, if fully disclosed to the stockholders in way of a non-coercive vote, . . . theoretically would result in dismissal under *Corwin* despite adequate pleading of a clear breach of loyalty on the part of the directors."), *aff'd sub nom. Anderson*, 265 A.3d 995.

[258] *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *10 (Del. Ch. Dec. 30, 2019) (quoting *Paramount*, 637 A.2d at 44).

concerns, CoStar extended its proposed closing deadline precisely because of its own apparent regulatory concerns. Second, the Board sought more cash consideration because CoStar's stock price was volatile and thus CoStar's revised bid did not reflect the nominal value that CoStar advanced, particularly given the lengthening closing timeline reflected in that bid. Notably, the Board based its view on financial analyses provided by Evercore, not Martell. Cash provided the value certainty that defined the Board's decision-making.

Having reviewed the Complaint's allegations and the documents integrated therein, I conclude that Plaintiff has failed to state a claim. The Board's choice to accept the relative certainty of an all-cash, high-premium transaction that contemplated a prompt closing over a nominally higher-value all-stock transaction that posed valuation and closing risks does not, as pleaded, support a reasonable inference of disloyalty.[259] To be clear, the Complaint's conclusory allegations also do not support a reasonably conceivable claim that Martell violated his fiduciary duties in connection with the Board's decision to counter the Revised Competing Proposal instead of declaring it a Superior Proposal. If anything, the Complaint

---

[259] *See Citrin v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 68 (Del. 1989) (In assessing a bid, the board may consider "the proposed or actual financing for the offer," "the consequences of that financing," and "the risk of nonconsummation." (cleaned up)).

supports a reasonable inference that the Board desired a deal with CoStar, but on terms CoStar was unwilling to accept.

In the end, the Board conducted a sale process that generated a substantial premium for the Company's stockholders. The Complaint does not support a reasonable inference that the sale process was infected by a conflict of interest. The Complaint does not support the extreme inference that the Board's minutes and the Company's disclosures are false. And the Complaint does not allege any reasonably conceivable facts implicating Martell personally in wrongdoing. Properly understood, then, the Complaint evinces a mere disagreement with the Merger. That does not state a claim under Delaware law. Accordingly, I dismiss the Complaint.

## CONCLUSION

For the foregoing reasons, Martell's motion to dismiss is GRANTED.